# 24-682-cv

## United States Court of Appeals
*for the*

## Second Circuit

◆

XERIANT, INC.,

*Plaintiff/Appellant,*

v.

AUCTUS FUND, LLC,

*Defendant/Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPENING BRIEF OF PLAINTIFF-APPELLANT

MARK R. BASILE
MARJORIE SANTELLI
THE BASILE LAW FIRM, P.C.
*Attorneys for Plaintiff-Appellant*
390 N. Broadway, Suite 140
Jericho, New York 11753
Te. 516.455.1500
Fax. 631.498.0478

## I.    RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Xeriant, Inc.., discloses and certifies that it is a publicly held corporation; that no publicly held corporation owns 10% or more of its stock, and that it has no affiliates and/or subsidiaries that are publicly held.

I.      RULE 26.1 CORPORATE DISCLOSURE STATEMENT ............................ i

II.     TABLE OF AUTHORITIES ..............................................................v

Relevant Definitions Under the Securities Exchange Act of 1934............ viii

III.    JURISDICTIONAL STATEMENT ..................................................1

IV.    ISSUE PRESENTED FOR REVIEW .............................................2

V.     STATEMENT OF THE CASE .......................................................3

VI.    STATEMENT OF THE FACTS ....................................................9

      A.    The Parties ......................................................................9

      B.    The Auctus Agreement. ..................................................10

           1.    The Securities Purchase Agreement ..............................11

           2.    The Note .................................................................12

           3.    The Auctus Warrant. ..................................................15

      C.    Amendments to the Agreement ...........................................16

      D.    Auctus Submits a Notice of Conversion for $0.01 per Share, and Claims Entitlement to *Five Times the Total Number of Xeriant Shares in Existence*17

VII.   Course of Proceedings in the district court....................................18

      A.    Auctus' Motion to Dismiss................................................19

      B.    The District Court Dismisses the Claim because Xeriant failed to allege "Facts Demonstrating that the Agreement . . . Obligated the Defendant to act as a Dealer." ...............................................................19

VIII.  SUMMARY OF THE ARGUMENT ...................................................21

IX.    ARGUMENT...................................................................23

A.     SECTION 29(B) PROVIDES A RIGHT to void CONTRACTS (1) "Made in Violation" of the Act or (2) Where Performance Involves a Violation of the Act.................................................................................23

B.     § 29(B) Cases permitting rescission of Contracts "Made in Violation" of the Act..................................................................................25

    1.     Mills v. Elec. Auto-Lite Co................................................25

    2.     *Berckeley v. Colkitt*: As Made, As performed................................25

C.     § 29(b) Claims for Contracts where "Performance involves a Violation" …………………………………………………………………26

    1.     For Unlawful Performance, the Violation must be Inseparable from the Performance of the Contract.............................................26

D.     § 29(b) Claims where "Performance involves a Violation" of § 15(a) all involve Broker Services Contracts, NOT SECURITIES Contracts..............27

E.     Section 29(b) Claim for Contracts "Made in Violation" of § 15(a)...28

    1.     *Eastside Church of Christ*— the Contract was Made in Violation of § 15(a) because the Unregistered Dealer "Violated the Act by Entering into" Securities Transactions. ......................................28

F.     Applcation to this case: like the defendant in *Eastside Church,* Auctus effected a transaction in securities when it entered into the agreement. .......29

    1.     As An Unregistered Securities Dealer, Auctus Violated § 15(a) by Effecting a Transaction in Securities (1) When it Purchased the Note and (2) When it Acquired the Warrant. ......................................29

    2.     Auctus is an (1) Unregistered + (2) (Securities) Dealer................30

    3.     Auctus Effected a Transaction in Securities When it Purchased the Convertible Promissory Note. .................................................30

    4.     A Convertible Promissory Note Is A "Security," a Warrant is a Security.......................................................................30

G.     THE DISTRICT COURT'S construction of section 15(a) is contrary to the plain language of the statute ...............................................32

iii

1.    §15(a) Contains No "Act Like  A Dealer" Prohibition: an Unregistered Dealer Violates §15(a) By Effecting a Transaction In Securities ................................................................32

2.    The District Court's Blind Reliance On *LG Capital* and *Vystar* is Misplaced, because Both Decisions Fail to Account for the Fact that a Convertible Promissory Note is a Security. ............................................33

3.    The *Vystar* Analysis Fails to Recognize that the Contract at Issue was Itself a Security, and Violated  15(a) "as Made" Where Effected  by an Unregistered Dealer. ..................................................35

4.    Prior to *Vystar* and *ExeLED*, Nearly all 29(b) Claims Based on a § 15(a) violation Were for Rescission of Brokerage Contracts..................36

5.    "Broker Services" and "Act Like a Broker" is Shorthand for all the "Broker" Activities Held to Violate Section 15(a), and Cannot Supplant the Language of the Statute. ..................................................37

H.    A PRIVATE RIGHT OF ACTION UNDER 29(B) IS WELL RECOGNIZED.............................................................38

X.    CONCLUSION...............................................................41

iv

## II.   <u>TABLE OF AUTHORITIES</u>

Cases

*Berckeley v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ....................................................25

*Boguslavsky v. Kaplan*, 159 F.3d 715, 722 (2d Cir. 1998)......................................38

*Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 391 (2d Cir. 1973) ........39

*Crown Bridge Partners, LLC v Sunstock, Inc.*, 2019 US Dist LEXIS 93393, 2019 WL 2498370 (SDNY June 3, 2019)............................................................................5

*Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50 (1st Cir. 2021) .........................................................................................................................37

*EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75 (S.D.N.Y. 2020) .................... passim

*Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783 (2d Cir. 1951) ................................38

*Foundation Ventures,LLC, v. F2g, Ltd.,*   2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. 2010) .........................................................................................................................37

*Geismar v. Bond & Goodwin, Inc.*, 40 F. Supp. 876 (S.D.N.Y. 1941) ....................39

*Goldstein v. Groesbeck*, 142 F.2d 422 (2d Cir. 1944).............................................38

*Leemon v. Burns*, 175 F. Supp. 2d 551, 559 (SDNY 2001) .....................................31

*LG Capital Funding, LLC v. Accelera Innovations, LLC*, 2018 U.S. Dist. LEXIS 137490, at *17 (E.D.N.Y. Aug. 10, 2018 .................................................................12

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.,* 2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018......................................................................................................20

*Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970)............................38

*Reeves v. Ernst & Young*, 494 U.S. 56, 64-65 (1990)..............................................31

*Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982). ........................................................................................................................27

*SEC v Almagarby*, 92 F4th 1306 (11th Cir 2024)……………………………..passim

*SEC v Big Apple Consulting USA, Inc*., 783 F3d 786 [11th Cir 2015]......................5

*SEC v Crown Bridge Partners, LL*C, 2022 US Dist. LEXIS 142555 [SD NY Aug. 8, 2022]) ............................................................................................................................6

*SEC v Ridenour, 913 F2d 515 [8th Cir 1990]* ...........................................................5

*SEC v. Auctus Fund Management, et al*,  Case No. 23-cv-11233-AK (D. Mass.) ....9

*SEC v. Carebourn Capital, L.P.*, 2023 WL 6296032 (D. Minn. Sept. 27, 2023).......5

*SEC v. Fierro*, 2024 U.S. Dist. LEXIS 90781 (D.N.J. May 21, 2024);.....................5

*SEC v. GPL Ventures LLC*,  2022 WL 158885 (S.D.N.Y. Jan. 18, 2022) .................5

*SEC v. Keener,* 2024 U.S. App. LEXIS 12894 (11th Cir. May 29, 2024)....... 5, 9, 29

*SEC v. River North Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019) ....................5

*SEC v.Fife*, 2021 WL 5998525, at (N.D. Ill. Dec. 20, 2021) ....................................5

*See Roth v. SEC*, 22 F.3d 1108,1109 (D.C. Cir. 1994).............................................4

*Transamerica Mortgage Advisors v Lewis,* 444 US 11, 16-17 [1979] ...................24

*Western Fed. Corp. v. Erickson*, 739 F.2d 1439 (9th Cir. 1984).............................40

*Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024) ...................................................38

Statutes

§ 29(b) of the Exchange Act ......................................................................... passim

15 U.S.C. § 78c(a)(10). ...........................................................................................38

15 U.S.C. § 78c(a)(5)) ..............................................................................................38

15 U.S.C. § 78cc(b).................................................................................................15

15 U.S.C. § 78o(a)(1). ......................................................................12

15 U.S.C. 78c(1)(13)). .....................................................................38

Rules

FINRA Rule 5110 ...................................................................... 13, 25

Treatises

*Gruenbaum & Steinberg, Section 29(b): A Viable Remedy Awakened*, 48 Geo Wash L Rev 1, 21 (1979) ...........................................................................24

Eugene F. Brigham & Joel F. Houston, *Fundamentals of Financial Management*, 891 (9th Ed. (Instructor's) 1999) ....................................................21

Hull, John C., *Options, Futures, and Other Derivatives*, 714 (5th Ed. 2002).........24

Regulations

17 C.F.R. § 230.144(d)(3)(x). ..................................................... 25, 40

## RELEVANT DEFINITIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934

(4)    BROKER.—

(A) In General.—

The term "broker" means any person engaged in the business of effecting transactions in securities for the account of others.

(5)    DEALER.—

(A) In General.—

The term "dealer" means any person engaged in the business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise.

(B) Exception for person not engaged in the business of dealing.—The term "dealer" does not include a person that buys or sells securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.

(9)    The term "person" means a natural person, company, government, or political subdivision, agency, or instrumentality of a government.

(10)    The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or on any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly

known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited. .

(13)   The terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire. For security futures products, such term includes any contract, agreement, or transaction for future delivery.   For security-based swaps, such terms include the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations under, a security-based swap, as the context may require.

(14)   The terms "sale" and "sell" each include any contract to sell or otherwise dispose of.   For security futures products, such term includes any contract, agreement, or transaction for future delivery.   For security-based swaps, such terms include the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations under, a security-based swap, as the context may require.

(47)   The term "securities laws" means the Securities Act of 1933 (15 U.S.C. 77a *et seq.*), the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*), the Sarbanes-Oxley Act of 2002 [15 U.S.C. 7201 *et seq.*], the Trust Indenture Act of 1939 (15 U.S.C. 77aaa *et seq.*), the Investment Company Act of 1940 (15 U.S.C. 80a–1 *et seq.*), the Investment Advisers Act of 1940 (15 U.S.C. 80b *et seq.*) [15 U.S.C. 80b–1 *et seq.*], and the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa *et seq.*).

### III.    JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291.  The United States Court for the Southern District of New York issued a Memorandum and Order dismissing all claims and closing the case on February 9, 2024, *see Xeriant, Inc. v. Auctus Fund, LLC*, 2024 U.S. Dist. LEXIS 23335 (S.D.N.Y. Feb. 9, 2024).    Appellant filed a timely notice of appeal on March 8, 2024.

## IV.   ISSUE PRESENTED FOR REVIEW

May an unregistered securities dealer purchase the Convertible Promissory Note in this case without violating Section 15(a) of the Securities Exchange Act of 1934?

Short Answer:  No.  Under §15(a) of the Exchange Act, it is unlawful for an unregistered securities dealer "to effect any transactions in  . . . any security." Because a convertible promissory note is a security, an unregistered securities dealer "effects a transaction in securities" when he purchases the note, or enters into a contract to purchase the note.

## V.    <u>STATEMENT OF THE CASE</u>

Under Section 15(a) of the Securities Exchange Act of 1934,

> **It shall be unlawful for any broker or dealer** … to make use of the mails or any means or instrumentality of interstate commerce **to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security** . . . **unless such broker or dealer is registered** in accordance with subsection (b) of this section.

§ 15(a) (codified at 15 U.S.C. § 78o(a)(1)). (emphasis added). "Section 15(a) prohibits unregistered dealers from using interstate commerce 'to effect *any transactions* in . . . any security.'" *SEC v. Almagarby*, 92 F.4th 1306, 1321 (11th Cir. 2024).

Beginning in 2018, the U.S. Securities Exchange Commission ("SEC") ramped up enforcement actions against so-called "toxic lenders" for operating as unregistered securities dealers in violation of § 15(a). Toxic lenders acquire "convertible" debt from small publicly-traded companies, convert the debt into common stock at a steep discount, and immediately sell the stock into the market at high volumes. *SEC v. Almagarby*, 92 F.4th 1306, 1312 (11th Cir. 2024). The toxic lender has no investment intent, but only acquires the stock to reap profits from the "spread" between the discount and the market price. "The process of acquiring new shares from an issuer 'for the purpose of reselling them'" is *quintessential* dealer activity. *Almagarby*, 92 F.4th at 1316-17.

3

Because "the process of acquiring new shares from an issuer" would ordinarily result in *restricted* stock (which could not be sold for at least six months) the toxic lender scheme only works *if **the initial debt is in the form of a convertible security**.* It is only because the convertible promissory notes and warrants are ***themselves securities to begin with that they may be "converted" into freely-trading stock***, a mechanism made possible under SEC Rule 144, 17 C.F.R § 230.144. Toxic lenders design the entire contract around Rule 144 to ensure that, upon conversion of a note (or exercise of a warrant) the lender acquires *freely-trading stock* that may be quickly sold into the market.

And sell it does. Unlike an investor, the lender has no interest in holding the stock; on the contrary, the lender sells the stock as quickly as possible to reap the 'spread' between the discount and the market price. Importantly however, no *registered* securities dealer would be permitted to engage in the abusive loan arrangements and enormous profit margins used by toxic lenders.[1]

---

[1] *See* FINRA Rule 5110(c)(2)(A). FINRA Rule 5110 prohibits excessive compensation, effects a fairness review of underwriting contracts, and would prohibit the various antidilution provisions in this case. The registration requirement under section 15(a) is not simply a ministerial exercise. Registration with the SEC and FINRA membership is regarded as the "keystone of the entire system of broker-dealer regulation," because it is the only effective means for SEC oversight. *See Roth v. SEC*, 22 F.3d 1108,1109 (D.C. Cir. 1994).

4

These loans are described as "toxic" or "death spiral" loans because the stock price is driven so low that many company-borrowers end up in bankruptcy. Once the lender obtains the stock from conversion of the note, it simply dumps the stock into the market, often in massive amounts--with no regard for damage to the borrower-company's stock price. The "influx of shares causes prices to plummet, the share dilution drives good-faith investors out of the market, and the issuing microcap company, or "issuer," can no longer access legitimate financing, a fact that may be the death knell of its business operations." *Almagarby*, 92 F4th at 1306. "When all is said and done, the . . . stock price can drop to or near a zero-dollar value. And the death spiral is complete." *Id*.

When combined with other relevant factors, the dealer status of these toxic lenders is undisputable, and every court to hear an SEC unregistered-dealer case has sided with the SEC,[2] (and affirmed on appeal in *Almagarby*). It is notable that the judgment the courts have imposed requires the toxic lender to disgorge profits and

---

[2] *See SEC v Big Apple Consulting USA, Inc*., 783 F3d 786 (11th Cir 2015); *SEC v Ridenour*, 913 F2d 515 (8th Cir 1990)*; SEC v. Almagarby*, 92 F.4th 1306, 1316-17 (11th Cir. 2024); *SEC v. Keener,* 2024 U.S. App. LEXIS 12894 (11th Cir. May 29, 2024); *SEC v.Fife*, 2021 WL 5998525, at (N.D. Ill. Dec. 20, 2021); *SEC v. GPL Ventures LLC*, 2022 WL 158885 (S.D.N.Y. Jan. 18, 2022); *SEC v. Fierro*, 2024 U.S. Dist. LEXIS 90781 (D.N.J. May 21, 2024); *SEC v. River North Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Carebourn Capital, L.P.*, 2023 WL 6296032 (D. Minn. Sept. 27, 2023).

stock, "surrender its conversion rights under all remaining convertible notes" and "surrender for cancellation all remaining warrants . . . ." *SEC v Crown Bridge Partners, LLC, Civ Action* No. 22-cv-06537, 2022 US Dist. LEXIS 142555, at *8-9 (SDNY Aug. 8, 2022).

### Section 29(b): Rescission of Contracts that Violate the Exchange Act

Taking note of the SEC's unregistered-dealer cases, the small companies victimized by toxic-financing schemes began to raise the defense of illegality against toxic lenders seeking to enforce convertible notes. Because § 15(a) itself does not allow a private right of action, claimants sought to void the notes or warrants under § 29(b) of the Exchange Act, which provides that any contract "made in violation of" the Exchange Act, or "the performance of which involves the violation" of the Act, "shall be void." 15 U.S.C. § 78cc(b).

The SEC brought suit against Defendant-Appellee in this case for operating as an unregistered securities dealer in violation of § 15(a) on June 1, 2023. *See SEC v. Auctus Fund Management, et al*, Case No. 23-cv-11233-AK (D. Mass.). Hence, because section 15(a) "prohibits unregistered dealers from using interstate commerce 'to effect *any transactions* in . . . any security'" *Almagarby*, at 1321, an unregistered securities dealer like Auctus would be "altogether prohibited" from purchasing a convertible promissory note or warrant to begin with.

That is— because a convertible promissory note and warrant are *indisputably securities* under Securities law; to purchase any one of these securities *effects a transaction in securities*. Accordingly, the contract in this case was **made in violation of § 15(a) of the Exchange Act** because, as an unregistered securities dealer, Auctus violated § 15(a) when it entered into the Agreement to begin with. *Almagarby*, 92 F.4th at 1321.

**Courts in the Southern District of New York Enforce Securities Transactions Effected by Unregistered Dealers Unless Performance of the Securities Contract Would Violate the Exchange Act.**

Unfortunately, in the context of convertible promissory notes, the Southern District of New York has fashioned its own interpretation of section 29(b): To succeed on a rescission claim under 29(b), the party seeking rescission *must show that performance of the agreement* would violate the Act—with the more recent iteration that the contract must obligate the unregistered securities dealer to "act like a dealer."

The problem: The SDNY formulation arbitrarily excises half of the statutory language providing that contracts "shall be void" – not just where performance would violate the act, but also those contracts *made in violation of the Act*. An analysis that looks to performance only, to the exclusion of contract formation, is contrary to the plain language of the statute, contrary to every Circuit court to render a decision on this issue, and contrary to the clear guidance

7

of the United States Supreme Court. Furthermore, the requirement that the contract must obligate the unregistered dealer to "act like a dealer," has no basis whatsoever in the statute.

## VI. <u>STATEMENT OF THE FACTS</u>

### A. THE PARTIES

Defendant-Appellee Auctus Fund, LLC, ("Auctus") is a Boston-based "hedge" fund that specializes in lending money to small publicly-traded companies.[3] Auctus lent money by purchasing convertible debt in the form of convertible promissory notes and stock purchase warrants. The Securities and Exchange Commission ("SEC") is currently suing Auctus for operating as an unregistered securities dealer in violation of section 15(a) of the Act. According to the SEC, Auctus operates a business similar to that described in *Almagarby* and *SEC v. Keener,* 2024 U.S. App. LEXIS 12894 (11th Cir. May 29, 2024), s*ee* ECF Nos. 1, 38 in *SEC v. Auctus Fund Management, et al*, Case No. 23-cv-11233-AK (D. Mass.).

Plaintiff-Appellant Xeriant, Inc., "Xeriant" is a small publicly-traded company that develops and commercializes aviation products; its stock that trades on the "over the counter" ("OTCQB") market under the symbol "XERI" and is considered a "penny stock."

---

[3] Auctus is as litigious as it is prolific. In the five-year period between 2016 and 2021, Auctus brought 53 civil actions to enforce toxic loans against 53 separate micorcap companies. *See SEC v. Auctus Fund Management, et al*., Case No. 23-cv-11233 (US. Dist. Mass.) ECF Doc. No. 1-1.

In the summer of 2021, Xeriant was negotiating a joint venture with a small aircraft company known as XTI, Inc., and needed capital to complete the deal. A-13-14. Xeriant was introduced to Auctus by its investment bank. A-14.

## B.    THE AUCTUS AGREEMENT.

In October 2021 Xeriant executed an loan agreement with Auctus, ("Agreement") whereby Auctus loaned Xeriant $5,142,500 via the purchase of a convertible "Senior Secured Promissory Note" in the amount of $6,050,000 ("Note") and a stock purchase warrant for 50,968,828 shares of Xeriant stock with a strike price of $0.11/per share ("Warrant"). The Agreement[4] is comprised of three main documents: the Note, the Warrant, and a Securities Purchase Agreement, which essential operates an umbrella agreement for the purchase of the Note and Warrant.

---

[4] There is almost no discussion in the pleadings regarding the provisions in the Agreement; the Complaint highlighted the only necessary fact that the Agreements are securities, and that Auctus is an unregistered securities dealer. A discussion is provided here simply to illustrate that the Agreement effected a transaction in securities, and to show general similarity to the other Auctus contracts described by the SEC.

10

**1.      The Securities Purchase Agreement**

The Securities Purchase Agreement ("SPA") is a contract effecting the purchase and sale of securities.  It sets forth the terms for Auctus' purchase (and Xeriant's sale) of the Note (a security) and the Warrant (also a security).   Page one of the SPA states the following:

**SECURITIES PURCHASE AGREEMENT**

\* \* \*

WHEREAS:

A. The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(a)(2) of the Securities Act of 1933, as amended (the "1933 Act") and Rule 506(b) promulgated by the United States Securities and Exchange Commission (the "SEC") under the 1933 Act;

B. Buyer desires to purchase from the Company, and the Company desires to issue and sell to the Buyer, upon the terms and conditions set forth in this Agreement, a senior secured promissory note of the Company, in the aggregate principal amount of $6,050,000.00  . . . convertible into shares of common stock, $0.00001 par value per share, of the Company (the "Common Stock"), upon the terms and subject to the limitations and conditions set forth in such Note;

C. The Buyer wishes to purchase, upon the terms and conditions stated in this Agreement, such principal amount of the Note as is set forth immediately below its name on the signature pages hereto;

D. The Company wishes to issue to the Warrant (as defined below) to the Buyer as additional consideration for the purchase of the Note, exercisable into shares of Common Stock, which shall be earned in full as of the Closing Date, as further provided herein.

11

SPA at 1. ECF. Paragraph A shown above refers to "the exemption from securities registration afforded by Section 4(a)(2) . . . and Rule 506(b)." This exemption permits Xeriant to legally sell – and Auctus to legally purchase- the Note and Warrant (both securities) without registering them under the 1933 Act. This boilerplate statement demonstrates that both parties understood that the Agreement effected a transaction in securities. The majority of the provisions in the Agreement appear to be written to ensure compliance with various securities law requirements. Paragraphs B-D above show that Auctus' only obligation under the Agreement is to purchase the Note—to wit, to *effect a transaction in securities*.

**2.    The Note**

Broadly speaking, a "convertible promissory note," is a debt instrument used for publicly-traded companies in which the lender acquires an option to take repayment of the debt in company stock.[5] This repayment, or "conversion" feature is the defining characteristic of the convertible note: in addition to the interest

---

[5] *See* Eugene F. Brigham & Joel F. Houston, *Fundamentals of Financial Management*, 891 (9th Ed. (Instructor's) 1999); Sharpe, William F., *et al.*, *Investments*, 5th Ed. at 716-17 (1995) ("A convertible bond is, for practical purposes, a bond with a nondetachable warrant plus the restriction that only the bond is usable [] to pay the exercise price."); *LG Capital Funding, LLC v. Accelera Innovations, LLC*, 2018 U.S. Dist. LEXIS 137490, at *17 (E.D.N.Y. Aug. 10, 2018).

payments or "commitment fees" due under the Note, it gives the holder the right to use the accrued debt to pay the exercise price of a call option on company stock. Page one of the Note contains a "restrictive legend," stating in part that

> **NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933,**

Note at 1. The Notes shows a principal amount of $6,050,000, payable in one year, at 0% percent interest, and charges an original issue discount of $907,500.00. The Disbursement authorization indicates that, after deduction of other various fees, Xeriant received a total of $4,708,950. A-34.

### a) *Conversion Rights.*

Unlike most of Auctus fixed-discount convertible notes, the Note in this case is convertible into stock "at the lesser of (i) $0.1187 or (ii) 75% of the offering price per share of Common Stock" in an anticipated uplist offering (apparently in connection with Xeriant's proposed merger). The Agreement in this case utilizes other provisions for most of its profits, either a "reset" provision in the Note, or the full-ratchet anti-dilution provision in the Warrants. *Compare SEC v. Auctus Fund Mgmt.*, et al. No. 23-cv-11233 (D. Mass.) (ECF Doc. 1 at ¶ 19 addressing warrant price-reset).

13

### b)    *Events of Default.*

Section 3 of the Note lists 20 "events of default, which included as one event "breach of covenants" under the SPA (listing approximately 22 covenants). A-61-63. Any event of default reset the Note principal to 125% of amount due. Paragraph 3.20 of the Note put Xeriant in default if it failed to acquire "100% of the equity interests" of the aircraft company XTI within 8 months of the October 27, 2021 issuance date of the Note. *Id.*

### c)    *"Dilutive Issuance" Reset Provision.*

Just like the provisions described in the SEC Complaint ¶ 19, Note § 1.6(e) provides that the conversion price "resets" if the borrower grants to any other entity, the right to acquire Xeriant stock at a lower price: Auctus conversion price would be reduced to that lower price, "in perpetuity regardless of whether" the stock was ever issued at that price. A-57.

14

### 3.  The Auctus Warrant.

The Warrant[6] gave Auctus the right to purchase 50,968,828 shares of stock at an exercise price of $0.1187 per share, for a period of five years[7]  However, just like the Note, the Warrant contained a so-called "anti-dilution" provision that permanently reset the strike price if, at any time the Warrant is outstanding, the company granted to any entity the right to purchase stock at a lower price.  As with the Note, the strike price would reset to that price, regardless of whether any stock was actually issued at that price. Warrant §2(b), A-39.

#### a)  *"Full Ratchet Adjustment."*

 However, unlike the Note, a "dilutive issuance" not only reset the Warrant strike price, it "reset" the number of shares that Auctus is entitled to purchase under the Warrant. This provision is known as a "full ratchet adjustment." No registered

---

[6] A warrant is similar to a stock call option (the right to buy a particular stock at a certain price for a limited period of time) except that it is given by the company for its own stock.   When a warrant is exercised, the company issues more of its own stock and sells them to the warrant holder for the strike price. Hull, John C., *Options, Futures, and Other Derivatives*, 714 (5th Ed. 2002) at 163.

[7] On the date of issuance, Xeriant stock was trading at $0.14/ per share; but Auctus would not obtain freely trading stock unless it held the Warrant for six months (and used cashless exercise).

securities dealer would be permitted to use a Warrant with this provision. *See* FINRA Rule 5110(8)(g).

> b) *Cashless Exercise.*

Cashless exercise allows the holder to obtain the warrant stock without putting up any cash; the holder just takes fewer shares at exercise, essentially selling back to the company the number of shares needed to pay for the strike price. A- 37. Importantly cashless exercise also permits the Auctus to obtain freely-trading stock under Rule 144 if it holds the Warrant for six months before exercise, *see* 17 C.F.R. § 230.144(d)(3)(x).

## C.  AMENDMENTS TO THE AGREEMENT

Although not addressed in the record, Xeriant's publicly-filed financial statements indicate that the parties twice amended the Agreement to extend the maturity date and allow Xeriant more time to complete the merger. *See* Xeriant Feb. 14, 2024 Quarterly Report at F-19.  A July 2022 amendment extended the deadline by four months, for which Xeriant paid Auctus another Warrant (to acquire 25,000,000 shares of stock at an exercise price of .09 per share) and $100,000 in cash. *Id*.  The parties amended the Agreement again in December 2022,  extending the deadline to March 15, 2023; in return, Auctus was given another stock purchase Warrant for the purchase of 250,000,000 shares of common stock at a strike price of $0.09 per share, and another $100,000 payment. *Id.*

16

By early 2023 it became apparent that the Xeriant merger would not happen. Court records show that on December 6, 2023, Xeriant brought suit against XTC for breach of contract, resolution of the case is still pending. *See Xeriant, Inc, v. XTC Aircraft Company*, Case No. 23-cv-10656 (S.D.N.Y.).

## D. AUCTUS SUBMITS A NOTICE OF CONVERSION FOR $0.01 PER SHARE, AND CLAIMS ENTITLEMENT TO *FIVE TIMES THE TOTAL NUMBER OF XERIANT SHARES IN EXISTENCE*

On October 6, 2023 Auctus began submitting Notices of Conversion based on a conversion price of $0.01 per share. Emails between Auctus and Xeriant's transfer agent show that Auctus requested that "its share reserve"[8] be increased to 2.5 billion shares-- apparently in preparation for its exercise of the Warrants and conversion of the Note. A-20.

This number of shares is enormous. Xeriant's May 2024 financial statement shows the total number of shares issued and outstanding as 455,044,644—less than 20% of the number of shares Auctus claims to be due. Xeriant contacted Auctus for

---

[8] *Reserve Shares*. Both the Warrant and the Note require Xeriant to maintain a certain number of "reserve shares" with its transfer agent. *See* Note at § 1.3; Warrant at § 4. Reserve shares are authorized but unissued shares that the transfer agent is instructed to earmark for conversions, and ensures that the lender can obtain the shares without delay—and *without interference from the company borrower*.

an explanation of the strike price and share demands, but no explanation was given.[9]

*Id.*

## VII.   COURSE OF PROCEEDINGS IN THE DISTRICT COURT

Xeriant filed suit in the U.S. District Court for the Southern District of New York on October 19, 2023, seeking, *inter alia*, a declaratory judgment that the Agreement is void under § 29(b) because Auctus is an unregistered securities dealer as defined in the Exchange Act, and that therefore "Auctus was not lawfully permitted to effectuate the securities transactions in this case." A-24. Xeriant's factual allegations on Auctus' operations as a securities dealer were taken directly

---

[9]  Neither the Complaint nor the pleadings provide an explanation for Auctus claim to be owed  this enormous number of shares.  However, Xeriant's November 2023 Quarterly Report seems to indicate that Xeriant sold a Note to a different lender that allowed a conversion price of $0.01 per share. If that were the case, it could trigger both the anti-dilution provision under the Note and the "Full Ratchet Adjustment" provisions in the Warrants, and yield an enormous amount of stock.
Full Ratchet Adjustment for Warrant 1: 50,968,828 x $0.1187  = $6,049,999.88 "aggregate" exercise price = 604,999,988 shares of stock at .01 per share.
Full Ratchet Adjustment Warrant 2:    25,000,000 x    $0.09 = $ 2,250,000 /.01 =225,000,000 shares of stock at .01 per share;
Full Ratchet Adjustment Warrant 3: 250,000,000 x .09 = $22,500,000 /.01 = 2,250,000,000 shares of stock at .01 per share.  Using the $0.01 price, Auctus would be entitled to purchase 3,079,999,988 shares of Xeriant stock at .01 per share for the life of the Warrants; using the price reset for the Note, Auctus was entitled to convert the debt under the Note at a price of $.01 per share, which would (assuming full conversion) yield 756,250,000 shares.

from the SEC Complaint against Auctus, which had been filed in the Massachusetts.

District Court four months prior to Xeriant's suit.

## A.  AUCTUS' MOTION TO DISMISS

In its motion to dismiss, Auctus argued that Xeriant's § 29(b) claim is meritless because, "clearly establish[ed] law in this District" holds that a plaintiff seeking to void an agreement on the basis that the lender is an unregistered dealer must "identify a provision . . . that obligates [the lender] to act as a broker-dealer." *Vystar Corp.*, 336 F.R.D. at 81.  According to Auctus, the agreement in this case "did not require Auctus to act as a dealer," but that Auctus "merely" purchased convertible promissory notes.  ECF Doc. 11 at 10 (this case, No. 23-cv-9200) citing *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020).

## B.  THE DISTRICT COURT DISMISSES THE CLAIM BECAUSE XERIANT FAILED TO ALLEGE "FACTS DEMONSTRATING THAT THE AGREEMENT  .  .  .  OBLIGATED THE DEFENDANT TO ACT AS A DEALER."

The district court dismissed of Xeriant's § 29(b) claim because courts in the Southern District of New York require that, where  a claimant seeks to void a convertible note based on a §15(a) dealer violation,  the contract must require the defendant to "act like a dealer." As the district court held:

19

Assuming, *arguendo*, that § 29(b) gives rise to a private cause of action[10] to void an agreement, the plaintiff would be required to allege facts demonstrating that the agreement the plaintiff seeks to void obligated the defendant to act as a dealer. Def. Mem. (Dkt 11) at 10-—1 (collecting cases); Def. Reply Mem. (Dkt 27) at 7-8. The complaint alleged no such facts.

A- 2.  Because the district court's dismissal incorporates the caselaw cited in the defendant's memoranda, those cases will be addressed in the analysis below. The two primary decisions on this issue (upon which nearly every court in the Southern District relies) are *EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75 (S.D.N.Y. 2020) and  *LG Capital Funding, LLC v. ExeLED Holdings, Inc.,* 2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018).  *Vystar* and *ExeLED* were wrongly decided because neither case accounts for the fact that convertible promissory notes are themselves securities.

---

[10] The district court assumed but did not decide whether "Section 29(b) gives rise to a private right of action to void an agreement." A-2.  As discussed briefly in Section H below, the private right of action under these sections has become well-established.

## VIII.  <u>SUMMARY OF THE ARGUMENT</u>

Claims seeking §29(b) rescission of convertible notes based on the lender's status as an unregistered dealer (in violation of §15(a)) began to appear in the New York Southern District in 2018 with *LG Capital Funding, LLC v. ExeLED*, in reaction to then-recent SEC prosecutions of unregistered securities dealers.

Unfortunately, the first two cases (*ExeLED* and *Vystar*, discussed below) were not well argued and advocated analysis appropriate for recission of a *brokerage* contract with an unregistered securities *broker*—not a securities contract effected by an unregistered dealer.  As a result,  the courts were never informed that a convertible note is a security.  Accordingly, the *ExeLED* and *Vystar* courts rejected the claims, on the ground that the *securities contract* effected by the unregistered dealer did not "require performance" that would violate § 15(a).   Shortly thereafter,  other courts began to state that *ExeLED* and *Vystar* are "precedent" in "this district" that must be followed.

This case is no different.  At the district court,  Xeriant asserted that Auctus is—by the nature of its business, an unregistered securities dealer as defined in the Exchange Act, and is therefore prohibited from effecting any transaction in securities.  Accordingly, because the Agreement in this case effects the purchase of a convertible note and warrant (both securities), Auctus violated § 15(a) of the Act when it entered into the Agreement to begin with.

21

In response, the district court noted the "precedent in this district" and rejected the claim because "the agreement that plaintiff seeks to void" does not "obligate[] the defendant to act as a dealer." Appendix "A" -2.

This holding is incorrect on multiple levels: First, § 15(a) prohibits an unregistered dealer "from effecting any transaction in securities," not "acting like a dealer." Second, section 29(b) voiding is not restricted to contracts requiring unlawful performance—it also voids contracts "made in violation" of the Exchange Act, which is what Xeriant has alleged in this case. Plaintiff-Appellant respectfully requests that this Court issue a ruling to finally correct this error.

## IX.   <u>ARGUMENT</u>

**A.     SECTION 29(B) PROVIDES A RIGHT TO VOID CONTRACTS (1) "MADE IN VIOLATION" OF THE ACT OR (2) WHERE PERFORMANCE INVOLVES A VIOLATION OF THE ACT.**

Section 29 of the Exchange Act (15 U.S.C. § 78cc) is entitled "**§ 29 Validity of Contracts**," of which subsection (b) provides aggrieved parties the right to rescind contracts where the formation or performance violates the act or any rule or regulation thereunder.  Id.  Section "29(b) itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions."  *Berckeley v. Colkitt*, 455 F3d 195, 204 (3d Cir. 2006).

Section 29(b) provides:

> **29(b) Contract provisions in violation of title.**
>
> Every contract **made in violation of any provisions of this title** or of any rule or regulation thereunder, **and** every contract . . . heretofore or hereafter made, **the performance of which involves the violation of,** or the continuance of any relationship or practice in violation of, **any provision of this title** or any rule or regulation thereunder, shall be void . . . .

18 U.S.C. § 78cc(b) (emphasis added)[11].  The plain language § 29(b) which clearly allows for the rescission (1) of any contract "*made in violation of any provision of*

<hr />

[11] To void a contract under § 78cc(b), the proponent must show that "(1) the contract involved a prohibited transaction; (2)  he is in contractual privity with [the party

23

*this title*" or (2) "*the performance of which* involves a violation of any provision of this title." § 78cc(b) (emphasis added).

In drafting section 29(b), Congress could not have been clearer: where a party demonstrated unlawful conduct occurred in the "making" of the contract, and/or where "performance" of the contract "involved a violation" of the Act, the contract was void. This means that the stated terms of a contract "could be perfectly lawful, yet the 'making' of the contract might involve a violation of the Act or its rules or regulations." *Section 29(b): A Viable Remedy Awakened*, 48 Geo Wash L Rev 1, 21 (1979). *See also Transamerica Mortgage Advisors v Lewis,* 444 US 11, 16-17 (1979) (observing that "contracts whose *formation* or *performance* would violate the Act "*shall be void*") (emphasis added).

---

seeking to enforce the contract]; and (3) he is in the class of persons that the securities acts were designed to protect." *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 363 (5th Cir. 1968), *cert. denied*, 393 U.S. 913 (1968); *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982). Because the district court's dismissal is ostensibly based on a failure of element (1), the court never reached elements (2) and (3).

24

## B.    § 29(B) CASES PERMITTING RESCISSION OF CONTRACTS "MADE IN VIOLATION" OF THE ACT.

### 1.    Mills v. Elec. Auto-Lite Co

*Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) is cited most frequently for holding that § 29(b) does not automatically void an unlawful contract, but is instead makes the contract void*able* by the non-violating party.  *Mills*, 396 U.S. 387-88. However, *Mills* also presents the most well-known discussion of a contract "made in violation" of the Exchange Act.  In *Mills*, plaintiff shareholders brought suit over a merger contract, alleging that Auto-Lite managers had gained their approval for the merger using proxies with materially false statements, in violation of §14(a) of the Exchange Act.    That is, the merger contract did not require unlawful performance, but was "made" in violation of § 14(a) of the Exchange Act.  The Court, in holding for the shareholders, noted that rescission of the contract under § 29(b) was an option because the violation of § 14(a) (unlawful proxy solicitation) was an "essential link" in the formation of the merger contract.  396 U.S. at 385.

### 2.    *Berckeley v. Colkitt*: As Made, As performed

*Berckeley v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) is instructive for this case because the plaintiff is a lender who brought suit against a borrowing company to enforce convertible securities.  The lender sought to enforce a series of convertible bonds, and the defendant claimed the contracts were void under § 29(b).

25

*Colkitt* raised two grounds for voiding under § 29(b): First, that the contract was *made* in violation of Section 10(b) of the Exchange Act because the lender had falsely stated that it would not unlawfully resell converted shares into the United States market; and (2) that the lender's *performance* of the contract violated the prohibitions on short-selling in Section 5 of the Securities Act of 1933.

The Third Circuit agreed with Colkitt's "made in violation" claim and reversed the district court's holding on that claim, stating

> The Section 10(b) claim alleges that Berckeley made material misrepresentations that induced Colkitt to enter into the Agreement. If Colkitt is able to prove that claim, then the Agreement was 'made in violation of' Section 10(b). The misrepresentations that induced Colkitt to enter into the Agreement would be inseparable from the underlying agreement between the parties.

*Berckeley*, 455 F.3d at 207 (3d Cir. 2006) (citation and quotation marks omitted).

## C. § 29(B) CLAIMS FOR CONTRACTS WHERE "PERFORMANCE INVOLVES A VIOLATION" OF THE ACT.

### 1. For Unlawful Performance, the Violation must be Inseparable from the Performance of the Contract.

The Third Circuit affirmed that Colkitt had no viable claim for an "as performed" violation, because the short-selling violation was tangential to the performance of contract. The court clarified that to validly allege an "as performed" violation, a claimant must "demonstrate a direct relationship between the violation at issue and the performance of the contract; i.e., the violation must be "inseparable

26

from the performance of the contract" rather than "collateral or tangential to the contract." *Id.* at 205.

## D.   § 29(B) CLAIMS WHERE "PERFORMANCE INVOLVES A VIOLATION" OF § 15(A) ALL INVOLVE BROKER SERVICES CONTRACTS, NOT SECURITIES CONTRACTS.

The classic instance of a contract calling for "unlawful performance" – and the most predominant use of section 29(b) voiding— are customers seeking to void a **brokerage contract** with an unregistered broker, in violation of § 15(a). The most widely-cited case for this scenario is *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982).

In *Regional Properties*, the developer contracted with a certain broker to structure and market limited partnership interests in return for a fee taken from the proceeds. After several mistakes, the developer learned that the broker was not registered as a broker-dealer with the SEC, and sued to have the contract voided under § 29(b). *Id.* 678 F.2d at 555-6. The court agreed that "Financial had been 'engaged in the business of selling securities for the accounts of the limited partnerships," without being registered as a broker, and that "Regional was entitled under §29(b) to rescission of its agreements with Financial because their "performance … involve(d) the violation of … (a) provision of (the Act)." Id. at 557.

27

Unlike the contract in this case, the broker-services contract in *Regional* was not itself a security, hence there could be no violation of §15(a) simply by entering into the contract.

## E. SECTION 29(B) CLAIM FOR CONTRACTS "MADE IN VIOLATION" OF BROKER-DEALER REGISTRATION UNDER § 15(A)

### 1. *Eastside Church of Christ*— the Contract was Made in Violation of § 15(a) because the Unregistered Dealer "Violated the Act by Entering into" Securities Transactions.

The best example of a §29(b) voiding a contract "made in violation" of the broker-dealer registration requirement of § 15(a) is found in *Eastside Church of Christ v. National Plan, Inc*., 391 F.3d 357 (5th Cir. 1968). In *Eastside Church*, the plaintiff church brought a § 29(b) action for rescission of certain bond contacts (bonds are *securities)* that it had issued to the purchaser-defendant National Plan. The church alleged that, because National Plan operated as both a securities broker and a dealer, National's purchase of the bonds was unlawful under § 15(a)(1). After review of the evidence, the Fifth Circuit agreed that National was indeed "a broker and a dealer within the meaning of the Act," and hence, because it was not registered, it could not lawfully effect the bond transactions in that case. The court held:

> Under § 15(a)(1), National was prohibited from effecting the transactions here involved and thus **violated the Act by entering into those transactions**. Under the voiding provision of § 29(b), it is sufficient to show merely that the prohibited transactions occurred and that appellants were in the protected class.

28

*Eastside Church*, 391 F.3d at 362 (citations omitted). Accordingly, the Fifth Circuit held the contract to be void and unenforceable. Although many courts seem to have viewed *Eastside Church* as an outlier, the 11th Circuit Court of Appeals discussed the case approvingly in its recent opinions in *Almagarby* and *Keener*, as a prime example of how section 15(a) applies to an unregistered dealer. *See Almagarby*, 92 F.4th at 1316; *Keener*, 2024 U.S. App. LEXIS 12894, at *8.

## F.   APPLCATION TO THIS CASE: LIKE THE DEFENDANT IN *EASTSIDE CHURCH,* AUCTUS EFFECTED A TRANSACTION IN SECURITIES WHEN IT ENTERED INTO THE AGREEMENT.

### 1.   As An Unregistered Securities Dealer, Auctus Violated § 15(a) by Effecting a Transaction in Securities (1) When it Purchased the Note and (2) When it Acquired the Warrant.

As reiterated by the *Almagarby* court, "Section 15(a) prohibits unregistered dealers from using interstate commerce "to effect *any transactions* in . . . any security." *Almagarby*, 92 F.4th at 1321. Section 15(a) provides:

> **It shall be unlawful** for any broker or dealer … to make use of the mails or any means or instrumentality of interstate commerce **to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security** (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

§ 15(a)(1) (codified as 15 U.S.C. § 78o(a)(1)) (emphasis added). Hence, it is unlawful for (1) an unregistered (2) broker or dealer, (3) effect any transactions in any security, or  (4) induce or attempt to induce the purchase or sale of any security.

29

### 2. Auctus is an (1) Unregistered + (2) (Securities) Dealer

The question of whether Auctus qualifies as a dealer under the Exchange Act is a factual question and presumed to be correct on a motion to dismiss.

### 3. Auctus Effected a Transaction in Securities When it Purchased the Convertible Promissory Note.

Auctus effected transactions in securities when it purchased the Note and Warrant. A "transaction" is not defined in the Exchange Act, but the term is universally understood to include a purchase or sale, but encompasses a broad range of actions. Under the Act, the terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire. (15 U.S.C. § 78c(a)(5)) and defines "sale" to include "any contract to sell or otherwise dispose of" a security (15 U.S.C. 78c(1)(13)).

### 4. A Convertible Promissory Note Is A "Security," a Warrant is a Security

As defined in the Exchange Act, the convertible promissory note in this case is presumptively a security. 15 U.S.C. § 78c(a)(10). A promissory note with a maturity date longer than nine months is presumptively a security, as is "a right to purchase" stock embodied by the conversion option. "The test begins with the language of the statute; because the Securities Acts define 'security' to include 'any note,' we begin with a presumption that every note is a security." *Reeves v. Ernst &*

*Young*, 494 U.S. 56, 64-65 (1990). *Leemon v. Burns*, 175 F. Supp. 2d 551, 559 (SDNY 2001).

### a) *A Convertible Promissory Note Must be a Security to Be "Convertible" into Freely-trading Stock.*

Presumptions aside, there can be no reasonable dispute that the Convertible Note is itself a security: if it was not a security, Auctus would be unable to "convert" the Note into Xeriant stock. In the context of securities law, "conversion" *can only occur between two securities*.[12] When the holder exercises the conversion right, no cash changes hands because the lender uses the debt instead of cash to pay the exercise price. *See LG Capital Funding, LLC v. Accelera Innovations, LLC*, 2018 U.S. Dist. LEXIS 137490, at *17 (E.D.N.Y. Aug. 10, 2018) (observing that with a convertible note, the lender "pre-paid" the exercise price "when it funded the note.").

---

[12] "Conversion" refers to the actual process where the holder (who may be exercising its right to convert) exchanges the convertible for a different security, such as shares of common stock. *Dictionary of Finance and Investment Terms*, 149 (10th Ed. 2018).

31

### b)  *Auctus Can Only Obtain Freely-Trading Stock at Conversion if the Note is a Security.*

Under Section 5 of the Securities Act of 1933 ("Securities Act" or "'33 Act") (15 U.S.C. § 77e), all securities sold in the United States public market must be either registered with the SEC or otherwise qualify for an exemption from registration, such as the Rule 144 exemption used by toxic lenders.  Rule 144 provides that qualifying unregistered securities may be freely sold after a six-month holding period.  Several conditions must be met to qualify for the Rule 144 exemption, but the Agreement in this case contains multiple provisions requiring Xeriant guarantee that Auctus will be able utilize Rule 144.  It is Rule 144 (or the abuse of it) that allows the lender to  immediately sell the shares acquired from conversion—as long as it held the Note for at least six months (17 C.F.R. § 230.144(d)(3)(ii).  The same provision allows freely trading stock upon exercise of a Warrant so long as the lender uses "cashless exercise," 17 C.F.R. § 230.144(d)(3)(x).

## G.   THE DISTRICT COURT'S CONSTRUCTION OF SECTION 15(A) IS CONTRARY TO THE PLAIN LANGUAGE OF THE STATUTE

### 1.   §15(a) Contains No "Act Like  A Dealer" Prohibition: an Unregistered Dealer Violates §15(a) By Effecting a Transaction In Securities,  As defined in the Exchange Act,  a "dealer"

According to the district court, a § 29(b) / §15(a) claim requires  the plaintiff to "allege facts demonstrating that the agreement the plaintiff seeks to void obligated

the defendant to act as a dealer."  A- 2. This "interpretation" has no support whatsoever in the language of the statute; §15(a) prohibits unregistered brokers or dealers from "effect[ing any transactions in . . . any security."

Moreover, the court never explains what "acting like a broker" or "acting like a dealer" actually means. Notably, other courts in this district seem to indicate "acting like a dealer" means buying *and* selling securities, per the definition of "dealer" in 15 U.S.C. § 78c(a)(5) and that a violation of § 15(a) is measured by *that* definition.  *See EMA Fin., LLC v. AppTech Corp.*, 2022 U.S. Dist. LEXIS 165560 (S.D.N.Y. Sep. 13, 2022).

However, that analysis only pertains the *entirely separate* determination of whether an entity is a securities dealer to begin with, *i.e.*, whether it "is in the business" of buying and selling securities for its own account.  *Id*.  Where an entity is deemed an unregistered dealer, § 15(a) commands that the dealer violates the act simply by *effecting a transaction in securities*--- not when it enters a contract obligating it to "act like a dealer."  Such an interpretation effectively re-writes federal securities law, and cannot be permitted.

**2.    The District Court's Blind Reliance On LG Capital and *Vystar* is Misplaced, because Both Decisions Fail to Account for the Fact that a Convertible Promissory Note is a Security.**

The Southern District of New York has developed a body of caselaw rejecting unregistered-dealer claims based on two cases: *EMA Fin., LLC v. Vystar Corp.*, 336

F.R.D. 75, 81 (S.D.N.Y. 2020), and *LG Capital Funding, LLC v. ExeLED Holdings, Inc.,* 2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018). *Vystar* and *ExeLED* are wrongly decided because neither case accounts for the fact that contracts in those cases (a Securities Purchase Agreement to purchase a convertible promissory note) are themselves securities.

In *LG Capital,* the parties executed a securities purchase agreement and a convertible promissory note similar to this case. *LG Capital* appears to be one of the first convertible-promissory-note cases where the defendant alleged a right to § 29(b) rescission of the note based on the lender's violation of § 15(a) as an unregistered securities dealer. The court rejected the claim, stating:

> Although it is an open question on this record whether LG should have registered as a "dealer" with the SEC… the Court concludes that even if LG should have registered, nothing in the Note or the SPA indicates that those contracts "could not have been legally performed" because LG failed to do so. It is unlawful for an unregistered broker to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." But neither the Note nor the SPA require LG to take any action that would violate this statute.

*ExeLED* at *15-16 (citations omitted). The above quoted analysis from *ExeLED* (as well as the record itself) reveals that the *ExeLED* court was never informed that the contracts in that case (a convertible note and a securities purchase agreement) *were themselves securities as defined in the Act.* Accordingly, the court's examination of the securities contracts that LG has entered into for language "requiring LG to take

34

any action that would violate the statute," (*i.e.*, to effect a transaction in securities) is somewhat of an absurdity, because LG had *already effected a transaction in securities* when entered into the contract to purchase the Note (and when it purchased the Note.

### 3. The *Vystar* Analysis Fails to Recognize that the Contract at Issue was Itself a Security, and Violated 15(a) "as Made" Where Effected by an Unregistered Dealer.

Just as in the *ExeLED* case, neither the parties nor the court in *EMA v. Vystar* seem to notice that the contract that the defendant sought to rescind (Securities Purchase Agreement for the purchase of a convertible note) was itself a transaction in securities, and that an unregistered securities dealer would have been prohibited under section 15(a) of the Exchange Act from purchasing the Note (a security) to begin with. The *Vystar* court held:

> Vystar claims that 'the underlying agreements [were] illegal when made as well as when performed" because Ema, as an unregistered broker-dealer, "could not have performed the contract with the share conversions and sales without violating the terms of the Exchange Act." In essence, Vystar contends that in entering and performing the contracts — in particular, the act of converting shares at a below-market rate and subsequently selling the shares — Ema acted as a broker-dealer and because Ema is not registered as a broker-*dealer, Ema has violated the Exchange Act.*

*Vystar,* 336 F.R.D at 81(citations omitted). As the above-quoted passage demonstrates, the flaw in the *Vystar* court's analysis stems from the defendant's

focus on conversion and sale of stock (more obvious transactions in securities) as well as a total failure to argue, (or to inform the court) that the "underlying agreement" effected a sale of a security. The *Vystar* court further observes:

> The flaw in Vystar's argument, however, is that it does not identify a provision in the contracts that obligates Ema to act as a broker-dealer. Certainly, Vystar contends that Ema has acted as a broker-dealer by converting the shares at a below-market rate and selling the shares. But Vystar does not explain why the act of converting shares violates the broker-dealer provision of the Exchange Act.

*Vystar*, 336 F.R.D. at 81-82. The court's observation that defendant in Vystar "does not identify a provision in the contracts that obligates EMA to act as a broker-dealer" seems to apply the same incorrect standard; the prohibited conduct under section 15(a) is "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. §78o.

## 4. Prior to *Vystar* and *ExeLED*, Nearly all 29(b) Claims Based on a § 15(a) violation Were for Rescission of Brokerage Contracts.

Prior to *Vystar* and *ExeLED*, claims for rescission under § 29(b) based on "failure to register" violations were restricted to claims brought by customers seeking to rescind brokerage contracts with a broker who was not registered. Prior to *ExeLED*, no 29(b) case in New York's Southern District involved an *unregistered dealer* violation. Because a brokerage contract does not effect a transaction in securities, and an unlicensed broker would not violate § 15(a) simply by entering into the contract, *cf. Eastside Church*, 391 F.3d 357.

36

**5.    "Broker Services" and "Act Like a Broker" is Shorthand for all the "Broker" Activities Held to Violate Section 15(a), and Cannot Supplant the Language of the Statute.**

Courts assessing whether performance of a  contract would obligate a violate §15(a) speak in terms of "whether the contract "on its face" requires the unregistered **broker** to perform "broker services." *See, e.g.,  Foundation Ventures,LLC, v. F2g, Ltd.*, 2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. 2010) ("To find a contract unenforceable for illegality at the pleading stage, the question is whether the contract "on its face" requires the unregistered finder to perform "broker services.").

The terms "broker services" and "act like a broker" are obviously not found in §15(a), but the phrase has been used in unregistered-broker cases as shorthand for broad range of activities encompassed by the phrase "induce or attempt to induce the purchase or sale" of any security. § 15(a)(1), 15 U.S.C. § 78o(a)(1). This has been held to include advertising for securities, assisting an issuer in structuring prospective securities transactions, or negotiating specific terms of a securities contract on behalf of another. *See Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 59 n. 5 (1st Cir. 2021) (listing cases and broad range of activities).   Obviously, this language cannot supplant the language provided in § 15(a), nor is it intended to.  However, as explained above, there *is no equivalent*

37

*"dealer services" contract*; a securities dealer does not need a services contract to effect a transaction in securities.

## H. A PRIVATE RIGHT OF ACTION UNDER 29(B) IS WELL RECOGNIZED.

The district court assumed "*arguendo*" "that Section 29(b) gives rise to a private right of action to void an agreement." A-2. However, the private right of action under this provision is fairly well established at this point. *See Transamerica*, 444 U.S. at, 19 ("The interests of the victim are sufficiently protected by giving him the right to rescind . . .")).

The Second Circuit has long recognized the right of an innocent party to bring an action for rescission under Section 29(b) to void a contract made or performed in violation of any provision of the Exchange Act of 1934. *See Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024); *Boguslavsky v. Kaplan*, 159 F.3d 715, 722 (2d Cir. 1998) ("Section 29(b) provides for the rescission of a contract if the contract violates any provision of the [Exchange] Act or its regulations."); *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1142 (2d Cir. 1970); *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 787 n. 4 (2d Cir. 1951) (recognizing intent of Congress to provide right of action under Section 29(b) (citation omitted)); *Goldstein v. Groesbeck*, 142 F.2d 422, 427 (2d Cir. 1944) (finding that Congress intended a right of recovery under Section 29(b)) (citing *Geismar v. Bond & Goodwin, Inc.*, 40 F. Supp. 876, 878 (S.D.N.Y.

38

1941) ("The 1938 amendment [the limitations provision] to Section 29(b) clearly contemplates that a civil suit against all of the defendants may be brought . . . not only for the cause of action for recission [] but also for the companion causes of action for money damages"); *see, e.g.*, *Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 391 (2d Cir.) (stating that "a defrauded shareholder also can bring suit for rescission and restitution under § 10(b) of the 1934 Act . . . or under § 29(b) of the 1934 Act . . .") *cert. denied*, 414 U.S. 910 (1973).

Although the Second Circuit has not decided specifically whether a rescission claim under Section 29(b) can be predicated upon a violation of Section 15(a)(1), *see Boguslavsky,* 159 F.3d at n. 6 (". . . we have yet to address whether an alleged violation of § 15(a)(1) can form the predicate for a rescission action under § 29(b)."), Section 29(b) by its terms applies to every contract made or performed in violation of "*any* provision of this title [15 U.S.C. §§ 78a *et seq.*] or *any* rule or regulation thereunder." 15 U.S.C. § 78cc(b) (emphasis added). There has been advanced no reasoned legal or factual argument for the exclusion of Section 15(a) from the literal scope of the voiding provision of Section 29(b), and courts in this Circuit have assumed without deciding that a rescission claim under Section 29(b) may be predicated on a violation of Section 15(a)(1), for failure to register as a broker-dealer. *See, e.g.*, *Boguslavsky*, 159 F.3d at 722 n. 6 ("We note that the Fifth Circuit has acknowledged the availability of such [§ 29(b) rescission] actions [for violations of

39

§ 15(a)(1)], *see Regional Properties,* 752 F.2d 178, 182, and the Ninth Circuit, also without actually deciding the issue, has suggested likewise, *see Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1443-44 n. 5 (9th Cir. 1984).").

Recently, in *Williams v. Binance*, the Second Circuit reversed the district court's dismissal of plaintiffs' Section 29(b) rescission claim alleging violations of Section 15(a)(1) based on its finding that the statute of limitations had begun to run upon the execution of the allegedly violative contract. 96 F.4th 129, 143-44 (2d Cir. 2024). The Second Circuit held that, because a violation of Section 15(a)(1) (sub-titled "Registration of all persons utilizing exchange facilities to effect transactions") clearly contemplates a transaction, plaintiffs' Section 29(b) claims could not have accrued until a transaction prohibited under Section 15(a)(1) had occurred. *Williams*, 96 F.4th at 145. Neither the Court nor the parties raised a doubt that a rescission claim under Section 29(b) could be predicated on a Section 15(a)(1) violation; it was simply assumed that a rescission action could brought for such a violation. *Id.* at 143-45.

## X. <u>CONCLUSION</u>

For the reasons discussed herein, Plaintiff-Appellant Xeriant, Inc., respectfully requests that the Court issue a ruling in its favor.

Dated: June 19, 2024

Respectfully Submitted,

*/s/* Marjorie Santelli
Marjorie Santelli, Esq.
*/s/* Mark R. Basile
Mark R. Basile, Esq.

THE BASILE LAW FIRM P.C.
390 N. Broadway, Ste 140
Jericho, New York 11753
Tel. 516.455.1500
Fax. 631.498.04 78
*marjorie@thebasilelawfirm.com*
*mark@thebasilelawfirm.com*

## XI.   <u>CERTIFICATE OF COMPLIANCE</u>

This Opening Brief by Plaintiff-Appellant Xeriant, Inc., has been prepared in accordance with Fed. R. App. 32(a)(7)(B) and Local R. 32.1 using: Microsoft Word, Times New Roman, 14 Point Type, with a total word count of 9,496, exclusive of the Corporate Disclosure Statement, Table of Contents, Table of Authorities, signature block, and Certificate of Compliance.