# 24-682

## United States Court of Appeals
## For the Second Circuit

---

XERIANT, INC.,

*Plaintiff–Appellant,*

*v.*

AUCTUS FUND LLC,

*Defendant–Appellee.*

---

On Appeal from the U.S. District Court
for the Southern District of New York
No. 23-cv-9200 (Hon. Lewis A. Kaplan)

---

**BRIEF FOR DEFENDANT–APPELLEE
AUCTUS FUND LLC**

---

Brian Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Dallas, TX 75201
(214) 698-3466

Marshall R. King
M. Jonathan Seibald
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
MKing@gibsondunn.com

*Counsel for Defendant-Appellee
Auctus Fund LLC*

July 24, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Auctus Fund LLC states that it is a Delaware limited liability company with its principal place of business in the State of Massachusetts. It has no corporate parent, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF ISSUES ......................................................................3

STATEMENT OF THE CASE .................................................................4

    I.    Factual Background ......................................................5

    II.    Procedural History.......................................................9

SUMMARY OF THE ARGUMENT ......................................................12

STANDARD OF REVIEW ....................................................................13

ARGUMENT ..........................................................................................14

    I.    The district court correctly held that Xeriant failed to plead a Section 29(b) claim. ...........................................14

        A.    Section 29(b) targets unlawful contracts, not the conduct of parties to contracts............................................16

        B.    Xeriant's contrary arguments are unavailing. ..............22

            1.    Xeriant's new "made in violation" theory is waived. ........................................................22

            2.    Xeriant is wrong in any event. ...............................25

    II.    In any event, Xeriant's claim is time-barred............................35

CONCLUSION .......................................................................................44

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Acuitas Cap., LLC v. Ideanomics, Inc.*,
2023 WL 4373314 (S.D.N.Y. June 21, 2023) ................................. 14, 20

*Alpha Cap. Anstalt v. Oxysure Sys., Inc.*,
216 F. Supp. 3d 403 (S.D.N.Y. 2016) .................................................. 42

*Anoush Cab, Inc. v. Uber Techs., Inc.*,
8 F.4th 1 (1st Cir. 2021) ..................................................................... 24

*Apollo Fuel Oil v. United States*,
195 F.3d 74 (2d Cir. 1999) .................................................................. 40

*Asch v. Philips, Appel & Walden, Inc.*,
867 F.2d 776 (2d Cir. 1989) ................................................................ 31

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ...................................................... 6, 8, 21

*Bassler v. Cent. Nat. Bank in Chicago*,
715 F.2d 308 (7th Cir. 1983) ............................................................... 33

*Bennett v. U.S. Tr. Co. of N.Y.*,
770 F.2d 308 (2d Cir. 1985) ................................................ 31, 32, 33

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) ............................................ 21, 26, 28, 29

*Brannan v. Eisenstein*,
804 F.2d 1041. (8th Cir. 1986) ............................................................ 31

*Buffalo Forge Co. v. Ogden Corp.*,
555 F. Supp. 892 (W.D.N.Y. 1983),
*aff'd*, 717 F.2d 757 (2d Cir. 1983) ..................................................... 33

*Buffalo Forge Co. v. Ogden Corp.*,
  717 F.2d 757 (2d Cir. 1983) ........................................................ 33, 34

*Cary Oil Co. v. MG Refin. & Mktg., Inc.*,
  230 F. Supp. 2d 439 (S.D.N.Y. 2002) ................................................ 35

*Celsion Corp. v. Stearns Mgmt. Corp.*,
  157 F. Supp. 2d 942 (N.D. Ill. 2001) ................................................ 42

*Cyber Apps World, Inc. v. EMA Fin., LLC*,
  645 F. Supp. 3d 281 (S.D.N.Y. 2022) .......................................... 14, 20

*DarkPulse, Inc. v. FirstFire Global Opportunities Fund, LLC*,
  2023 WL 199196 (S.D.N.Y. Jan. 17, 2023), *aff'd in part,
  vacated in part on other grounds*, 2024 WL 1326964 (2d
  Cir. Mar. 28, 2024) ..................................................................... 14, 43

*de la Fuente v. DCI Telecomms., Inc.*,
  206 F.R.D. 369 (S.D.N.Y. 2002) ...................................................... 43

*Discover Growth Fund, LLC v. Camber Energy, Inc.*,
  602 F. Supp. 3d 982 (S.D. Tex. 2022) ............................................... 19

*Drasner v. Thomson McKinnon Securities, Inc.*,
  433 F. Supp. 485 (S.D.N.Y. 1977) ............................................... 26, 27

*Eastside Church of Christ v. National Plan, Inc.*,
  391 F.2d 357 (5th Cir. 1968) ...................................................... 29, 30

*EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*,
  6 F.4th 50 (1st Cir. 2021) .............................................................. 30

*EMA Fin., LLC v. AppTech Corp.*,
  2022 WL 4237144 (S.D.N.Y. Sept. 13, 2022) .................... 14, 15, 20, 22

*EMA Fin., LLC v. Joey N.Y. Inc.*,
  2022 WL 292920 (S.D.N.Y. Feb. 1, 2022) ..................................... 14, 20

*EMA Fin., LLC v. NFusz, Inc.*,
  509 F. Supp. 3d 18 (S.D.N.Y. 2020) ............................................ 21, 35

*EMA Fin., LLC v. Vystar Corp.*,
  336 F.R.D. 75 (Apr. 18, 2020) ........................................................ 15, 21

*EMA Fin. v. TPT Glob. Tech, Inc.*,
  2023 WL 7043227 (S.D.N.Y. Oct. 26, 2023) ................................. 14, 20

*Forras v. Andros*,
  184 F. App'x 33 (2d Cir. 2006) ............................................................ 19

*Foundation Ventures, LLC v. F2G, Ltd.*,
  2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010) ..................................... 15

*Frati v. Saltzstein*,
  2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) ..................................... 19

*GFL Advantage Fund, Ltd. v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001) ................................................................ 21

*Goodman v. Shearson Lehman Bros., Inc.*,
  698 F. Supp. 1078 (S.D.N.Y. 1988) ..................................................... 31

*Grullon v. Delta Air Lines, Inc.*,
  2021 WL 6116784 (2d Cir. Dec. 27, 2021) .......................................... 24

*Headley v. Tilghman*,
  53 F.3d 472 (2d Cir. 1995) .................................................................. 35

*Joseph v. Ocwen Fin. Corp.*,
  2023 WL 3635077 (2d Cir. May 25, 2023) .......................................... 24

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
  970 F.2d 1030 (2d Cir. 1992) ...........................35, 36, 37, 39, 41, 42, 43

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
  501 U.S. 350 (1991)............................................................................. 42

*LG Cap. Funding, LLC v. ExeLED Holdings, Inc.*,
  2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018),
  *vacated on other grounds*, 2022 WL 16751904
  (S.D.N.Y. Nov. 7, 2022)........................................ 14, 18, 19, 21, 27, 33

*Link v. Wabash R.R. Co.*,
  370 U.S. 626 (1962) ............................................................... 25

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010) .......................................................... 36, 42

*MFS Sec. Corp. v. N.Y. Stock Exch., Inc.*,
  277 F.3d 613 (2d Cir. 2002) ............................................... 13

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ............................................................. 33

*N.Y.U. v. First Fin. Ins. Co.*,
  322 F.3d 750 (2d Cir. 2003) ............................................... 40

*NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*,
  80 F.4th 413 (2d Cir. 2023) .............................. 15, 16, 17, 18, 26, 30, 31

*Occidental Life Ins. Co. v. Pat Ryan & Assocs., Inc.*,
  496 F.2d 1255 (4th Cir. 1974) ........................................... 26

*Omega Overseas Partners, Ltd. v. Griffith*,
  2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014) ............................ 17, 26, 31

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
  933 F.3d 99 (2d Cir. 2019) ...................................... 16, 17, 18

*Parallax Health Scis., Inc. v. EMA Fin., LLC*,
  2022 WL 1446521 (S.D.N.Y. Feb. 24, 2022), *adopted as
  modified*, 2022 WL 2531344 (S.D.N.Y. Apr. 7, 2022) ......................... 14

*Pearlstein v. Scudder & German*,
  429 F.2d 1136 (2d Cir. 1970) ................................. 15, 25, 26

*Rai v. WB Imico Lexington Fee, LLC*,
  802 F.3d 353 (2d Cir. 2015) ............................................... 40

*Reg'l Props., Inc. v. Fin. & Real Est. Consulting Co.*,
  678 F.2d 552 (5th Cir. 1982) ............................................. 30

vi

*Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011) ............................................................. 13

*Roth v. SEC*,
  22 F.3d 1108 (D.C. Cir. 1994) ........................................................ 32

*SEC v. Auctus*,
  No. 23-cv-11233-AK (D. Mass.) ..................................................... 19

*SEC v. Seaboard Corp.*,
  677 F.2d 1301 (9th Cir. 1982)........................................................ 31

*Singleton v. Wulff*,
  428 U.S. 106 (1976)........................................................................ 19

*Social Life Network, Inc. v. Peak One Opportunity Fund,*
  *L.P.*,
  2023 WL 2838095 (S.D. Fla. Feb. 13, 2023)................................. 41

*Social Life Network, Inc. v. LGH Invs., LLC*,
  2023 WL 3641791 (9th Cir. May 25, 2023) ..................... 37, 39, 41, 44

*United States v. Mendonca*,
  88 F.4th 144 (2d Cir. 2023)............................................................ 25

*United States v. Wasylyshyn*,
  979 F.3d 165 (2d Cir. 2020) ..................................................... 23, 24

*Wal–Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ............................................................. 22

*Weiss v. Altholz*,
  2011 WL 4538459 (N.D. Ill. Sept. 29, 2011)................................ 36

*Williams v. Binance*,
  96 F.4th 129 (2d Cir. 2024)................................................... 4, 13, 35

*XY Planning Network, LLC v. SEC*,
  963 F.3d 244 (2d Cir. 2020) .......................................................... 32

*Yi v. GTV Media Grp., Inc.*,
    2021 WL 2535528 (S.D.N.Y. June 18, 2021) ..................................... 20

*Zerman v. Jacobs*,
    510 F. Supp. 132 (S.D.N.Y.),
    *aff'd*, 672 F.2d 901 (2d Cir. 1981) ..................................... 17

**Statutes**

15 U.S.C. § 78cc(b)... 1, 2, 3, 4, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 22,
    23, 24, 25, 26, 27, 29, 30, 31, 33, 34, 35, 36, 41, 43, 44

15 U.S.C. § 78o(a) ................ 2, 3, 14, 18, 19, 21, 27, 29, 30, 31, 32, 42, 43

15 U.S.C. § 80a-46(b) ............................................................... 17

15 U.S.C. § 80b-15(b) ...................................................... 16, 36, 37

28 U.S.C. § 1291 ....................................................................... 3

28 U.S.C. § 1331 ....................................................................... 3

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................... 13

**Regulations**

17 C.F.R. § 230.144 ................................................................. 28

17 C.F.R. § 240.15b1-1 ............................................................. 8

49 Fed. Reg. 20,512 (SEC May 15, 1984) ................................... 32

FINRA Rule 144 ...................................................................... 28

FINRA Rule 5110 .............................................................. 27, 28

## INTRODUCTION

In 2021, Xeriant—a sophisticated aerospace technology provider—was a public company in search of funding. It sought financing to fulfill its obligation to provide capital to a joint venture it had recently formed with an aircraft company. Xeriant thus hired and paid a registered broker-dealer to connect it with investors. The broker-dealer connected Xeriant with Auctus, which often invested in smaller publicly traded companies like Xeriant. Following negotiations between Xeriant and Auctus, the parties signed an agreement on October 27, 2021, under which Auctus provided Xeriant with approximately $5 million. That cash infusion enabled Xeriant to provide the required funding to its joint venture.

Having achieved its goal, Xeriant now wants to renege on its contractual obligations. Taking a page out of the playbook of plaintiffs' lawyers who have filed many similar lawsuits in recent years, Xeriant asserted a claim under Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), seeking to void its contract with Auctus. This claim is meritless—as every judge in this Circuit to have addressed the issue has held.

1

Xeriant alleges that Auctus violated the Exchange Act by purportedly acting as an unregistered securities "dealer" in violation of Section 15(a), 15 U.S.C. § 78o(a). But whether that is true or not (and it is not), that has nothing to do with the parties' contract. Section 29(b) concerns "contracts," not conduct. Auctus loaned money to Xeriant through a convertible note, a common method of financing employed by non-registered entities (including Xeriant's own senior executive) all the time. The loan is perfectly lawful, and nothing in the contract required Auctus to act a "dealer." Any alleged "dealing" is tangential to the contract, and thus not a basis to "void" a contract under Section 29(b). Judge Kaplan is the tenth judge in this Circuit to hold exactly this, and Xeriant has not identified anything even approaching reversible error.

Regardless, this Court should affirm dismissal on the alternative ground that Xeriant's lawsuit is untimely. It is undisputed that Xeriant's Section 29(b) claim was subject to a one-year statute of limitations from when Xeriant knew or should have known the facts underlying its claim. Consistent with prior rulings of this and other courts in similar cases, that period began to run on October 27, 2021, the day Xeriant executed

the contract at issue here. Xeriant's lawsuit, filed in October 2023, was a year too late.

## JURISDICTIONAL STATEMENT

As relevant here, Xeriant invoked the district court's subject-matter jurisdiction under 28 U.S.C. § 1331 because count I of Xeriant's complaint purportedly arose under the Securities Exchange Act of 1934. *See* App. A-10 ¶¶ 1–2, A-24 to A-25 ¶¶ 84–96; *see also* App. A-1. This Court has jurisdiction under 28 U.S.C. § 1291 because Xeriant appeals a judgment finally disposing of all claims in this action.

## STATEMENT OF ISSUES

I. Xeriant borrowed approximately $5 million and agreed—in writing—that the lender, Auctus, was performing no services for Xeriant; Auctus "is acting solely in the capacity of arm's length purchaser." App. A-80. Nevertheless, after defaulting on the loan, Xeriant filed this lawsuit, seeking to void the loan agreement under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), on the ground that Auctus was purportedly an unregistered securities "dealer" in violation of Section 15(a), 15 U.S.C. § 78o(a). The question presented is whether the district court properly dismissed Xeriant's claim because, whatever the merits of

3

Xeriant's "dealer" allegation, the loan agreement did not require Xeriant to act as a "dealer" and, thus, is not an unlawful contract.

II.     In *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024), this Court held that a Section 29(b) claim is subject to a one-year limitations period from the time the claim accrued. *Id.* at 143. Here, Xeriant does not dispute that Auctus's registration status is (and has always been) readily available as a matter of public record. The question presented is whether the judgment below should alternatively be affirmed on the ground that Xeriant's claim—filed two years after Xeriant executed the transaction— is barred by the one-year limitations period.

## STATEMENT OF THE CASE

This case is part of a publicly traded corporation's effort to renege on its agreements, after the statute of limitations has run, and receive a windfall of millions of dollars in the process. Xeriant borrowed approximately $5 million from Auctus. Two years later, Xeriant, then in default, sought to void the loan on the ground that its lender, Auctus, was allegedly an unregistered securities "dealer." But the United States District Court for the Southern District of New York (Kaplan, J.) properly dismissed the case, because whatever the merits of Xeriant's "dealer"

4

theory, that had nothing to do with the loan agreements, which did not require Xeriant to act as a "dealer." The district court's decision is not reported but is available at 2024 WL 1151719.

## I. Factual Background

In 2021, Xeriant—a sophisticated, publicly traded aerospace company—sought "bridge financing for funding a joint venture with an aircraft company" that was developing a new electric aircraft. App. A-13, 14 ¶¶ 18, 24.

To that end, Xeriant obtained assistance from its "trusted fiduciary agent" and registered broker-dealer, Maxim Group LLC, to "help facilitate the sourcing of funds" for the joint venture. Supp. App. 32; App. A-14 ¶ 25; App. A-34. According to Xeriant, it "relied" on "Maxim to guide, counsel and help shepherd its executives on how to source the best funding to help Xeriant achieve its desired end goal of acquiring [the aircraft company]," and "[t]he entire transaction was offered, considered, and executed through Maxim." App. A-14, 15 ¶¶ 27, 33.

Maxim put Xeriant in touch with Auctus, a hedge fund that, among other investments, provided convertible loans to public companies "in need of cash." *Id.* at A-11, A-14 ¶¶ 8, 28. The borrowers in such

5

transactions could repay these convertible loans either in cash or by converting the debt into shares of the borrower's stock, which Auctus could then hold or sell as it wished. *Id.* at A-13 ¶ 22.

According to Xeriant, "at the time of Xeriant's need for funding," its "agent" Maxim was already familiar with Auctus and its ability to provide convertible loans to companies needing financing. *Id.* at A-14 ¶ 29; Supp. App. 32. Moreover, Xeriant itself was, at that point, familiar with convertible loans. For example, in 2020 Xeriant entered into a convertible loan agreement with a company owned by Xeriant's own CFO. *See* Xeriant, Inc., Form 10-Q/A, Item 1 n.7 (Nov. 24, 2021), http://tinyurl.com/wpcke8tc ("On August 25, 2020, [Xeriant] issued a convertible note . . . to Keystone Business Development Partners, a Company owned by [Xeriant]'s CFO, Brian Carey . . . The agreement provides the holder has the option to convert the principal balance and any accrued interest to common stock of the Company at a conversion price of $.025 per share.").[1]

---

[1] The Court may take judicial notice of "legally required public disclosure documents filed with the SEC." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Auctus cited this public filing

6

On October 27, 2021, Auctus and Xeriant reached an agreement after an arms'-length negotiation, executing a series of transaction documents that collectively formed the final convertible loan agreement (the "Agreement").  *See* App. A-15 ¶ 36; *id.* at A-74 (Securities Purchase Agreement); *id.* at A-51 (Senior Secured Promissory Note); *id.* at A-36 (Common Stock Purchase Warrant).  The Agreement was signed by Keith Duffy, Xeriant's Chief Executive Officer, *see id.* at A-45, A-92, and "duly authorized" by Xeriant's Board of Directors, *id*. at A-77 § 3(b).

Under the Agreements, "Auctus loaned Xeriant $5,142,500." Xeriant Br. 10, ECF No. 25.1; App. A-15 ¶ 37, A-34 (Disbursement Authorization).  Xeriant was required to repay the loan within one year, either in cash or Xeriant stock.  *See* App. A-52 § 1.1.  Nothing in the Agreement required Auctus to sell any converted shares it acquired.

On the day the Agreement was executed, the fact that Auctus had previously made convertible loans was a matter of public record.  A simple search of corporate disclosure statements on the SEC's EDGAR

---

below in support of its motion to dismiss, *see* Supp. App. 14 n.4.  Xeriant did not oppose the Court taking judicial notice of it, *see id.* at 25–37.

database at https://sec.gov/edgar would have reflected numerous public company filings related to convertible loans provided by Auctus.[2] Similarly, on the day the Agreement was executed, the fact that Auctus was not a registered broker-dealer "could be easily found," Supp. App. 31, by searching Auctus's name on FINRA's website (https://brokercheck.finra.org/), which lists every registered broker-dealer, *see* 17 C.F.R. § 240.15b1-1.

There is no dispute that Auctus upheld its end of the bargain and advanced Xeriant the $5 million for Xeriant to finance its joint venture. Xeriant Br. 10; App. A-15 ¶ 38. Xeriant did not repay the $5 million in

---

[2] *See, e.g.*, Nexgel, Inc. Form 8-K, Item 1.01 (Mar. 11, 2021), https://tinyurl.com/yeymbjb5 ("Auctus may convert any amount due . . . at any time . . . into shares of [Nexgel, Inc.'s] common stock."); Blow & Drive Interlock Corp. Form 8-K, Item 1.01 (Feb. 26, 2020), https://tinyurl.com/2wwpnufk ("Under the terms of the Auctus Note, Auctus has the right, at any time to convert all or part of the amounts due to it under the Auctus Note into shares of our common stock."); NanoFlex Power Corp. Form 8-K, Item 1.01 (May 3, 2019), https://tinyurl.com/4zcxwvzk ("Pursuant to the Auctus Note, Auctus may convert all or a portion of the outstanding principal of the Auctus Note into shares of Common Stock of the Company."). The Court may take judicial notice of "legally required public disclosure documents filed with the SEC." *ATSI Commc'ns, Inc.*, 493 F.3d at 98. Auctus cited these public filings below in support of its motion to dismiss, *see* Supp. App. 13 n.3. Xeriant did not oppose the Court taking judicial notice of them, *see id.* at 25–37.

cash, despite multiple extensions. Xeriant Br. 16. On October, 6, 2023, almost two years after lending $5 million to Xeriant, Auctus sought to convert a portion of the debt into Xeriant stock, in accordance with the Agreement. App. A-20 ¶¶ 66-67. Despite having received the benefit of the $5 million loan to fund its joint venture, Xeriant then repudiated the Agreement. It "refused . . . to approve th[e] transfer of stock" to Auctus. *Id.* at A-21 ¶ 69.

This lawsuit followed. Xeriant filed the complaint on October 19, 2023, almost two years after the parties entered into the Agreement. Almost all of the $5 million in principal that Auctus lent Xeriant (plus interest and default penalties) remains outstanding.

## II.   Procedural History

On October 19, 2023, Xeriant filed the Complaint against Auctus, seeking a declaratory judgment voiding the Agreement under Section 29(b) of the Securities Exchange Act of 1934 because Auctus was allegedly an unregistered dealer. *See* App. A-23 to A-25. (Xeriant's Complaint included several other causes of action, all of which were dismissed without opposition. *See id.* at A-26 to A-29; *id.* at A-2 ("plaintiff

9

has not sought to defend the sufficiency of its state law claims, which therefore are dismissed")).

Auctus moved to dismiss. Auctus explained that Xeriant's Section 29(b) claim failed because unanimous precedent made clear that an agreement cannot be voided under Section 29(b) on the basis that a party is not registered as a dealer unless the agreement *requires* that party to act as a dealer. Supp. App. 15–17. Auctus further explained that Xeriant's claim was time-barred anyway, because the one-year limitations period had expired in October 2022—one year after Xeriant entered into the Agreement. At signing, Xeriant knew or could have easily discovered the facts underlying its Section 29(b) claim. *See id.* at 11–15.

Xeriant failed to respond to Auctus's motion and judgment was entered for Auctus. *See* App. A-5 (District Court Docket), Dkt. No. 13 (Notice of Plaintiff's Non-Opposition to Motion to Dismiss). Following a motion by Xeriant, the district court later vacated the dismissal order and allowed Xeriant to file an opposition. *See id.*, Dkt. No. 24. Xeriant argued that it stated a cognizable claim under Section 29(b), because "Auctus' lending practice improperly utilizes these convertible note

Agreements, to acquire and in fact sell public securities into the market," allegedly "allow[ing] the 'continuance of any…practice in violation' of the Act." Supp. App. 34 (quoting 15 U.S.C. § 78cc(b)).

Judge Kaplan granted Auctus's motion to dismiss. *See* App. A-1 (Memorandum and Order). Although the court agreed that a Section 29(b) claim is subject to a one-year statute of limitations from the time the plaintiff knew or should have known of the facts underlying its claim, the court declined to dismiss on statute of limitations grounds. Instead, the court rejected Xeriant's Section 29(b) claim on the merits. Consistent with every court to have considered this question with respect to similar Section 29(b) claims, the district court held that Xeriant had failed to state a Section 29(b) claim because, "[a]ssuming *arguendo* that Section 29(b) gives rise to a private right of action to void an agreement, the plaintiff would be required to allege facts demonstrating that the agreement the plaintiff seeks to void obligated the defendant to act as a dealer. The complaint alleged no such facts." App. A-2. The district court rejected Xeriant's attempt to distinguish this case from all the others denying Section 29(b) claims because "Plaintiff's contention that the agreement at issue may be voided on the theory that it permitted

11

defendant to continue a practice that plaintiff regards as inconsistent with the objective of the Exchange Act registration provision . . . is unsupported by authority and unpersuasive." *Id.*[3]

Xeriant appealed the dismissal of its Section 29(b) claim.

## SUMMARY OF THE ARGUMENT

The decision below should be affirmed.

**I.** Section 29(b) is centered on *contracts*, not the *conduct* of parties to the contracts. Judge Kaplan was thus the tenth judge in this Circuit to correctly dismiss attempts to void a convertible loan on the ground that the lender was allegedly a securities "dealer."

Under Xeriant's (and other plaintiffs') theories, a "dealer" is a business that buys *and sells* securities. But the loan agreement here is simply an arms' length loan. It does not require Auctus to sell anything or to act as a "dealer" in any way. Thus, any alleged "dealing" is tangential to the contract and not a basis to "void" the loan agreement under Section 29(b).

---

[3] The district court granted as unopposed Auctus's motion to dismiss Xeriant's four state law claims. *See* App. A-2 ("[P]laintiff has not sought to defend the sufficiency of its state law claims, which therefore are dismissed").

**II.**  Alternatively, this Court's decision in *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024), establishes that a Section 29(b) claim is subject to a one-year-from-discovery limitations period.  Xeriant waited two years to file suit.  Its claim is thus untimely.

Below, Xeriant argued that the limitations clock never started because Xeriant did not know the factual basis of its claim.  But as every other court to consider claims identical to Xeriant's has held, Xeriant, with minimal diligence, could easily have discovered the factual basis on the day the Agreement was executed.  Xeriant itself acknowledges not only that all of the information Xeriant could have needed to know was publicly and readily available, but also that Xeriant's agent *in fact* already knew that information.  Xeriant's two-year delay in filing suit is fatal here.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) *de novo*.  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011).  The Court may "affirm on any ground appearing in the record."  *MFS Sec. Corp. v. N.Y. Stock Exch., Inc.*, 277 F.3d 613, 617 (2d Cir. 2002).

13

## ARGUMENT

### I. The district court correctly held that Xeriant failed to plead a Section 29(b) claim.

Judge Kaplan is at least the tenth judge in this Circuit to hold that contracts nearly identical to the one at issue here may not be rescinded under Section 29(b) because they do not require a violation of Section 15(a). App. A-2; *see also LG Cap. Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160, at \*1 (S.D.N.Y. Sept. 28, 2018) (Sullivan, J.), *vacated on other grounds*, 2022 WL 16751904 (S.D.N.Y. Nov. 7, 2022); *EMA Fin. v. TPT Glob. Tech, Inc.*, 2023 WL 7043227, at \*5 (S.D.N.Y. Oct. 26, 2023); *DarkPulse, Inc. v. FirstFire Global Opportunities Fund, LLC*, 2023 WL 199196, at \*11 (S.D.N.Y. Jan. 17, 2023), *aff'd in part, vacated in part on other grounds*, 2024 WL 1326964 (2d Cir. Mar. 28, 2024); *Acuitas Cap., LLC v. Ideanomics, Inc.*, 2023 WL 4373314, at \*1 (S.D.N.Y. June 21, 2023); *Cyber Apps World, Inc. v. EMA Fin., LLC*, 645 F. Supp. 3d 281, 286 (S.D.N.Y. 2022); *EMA Fin., LLC v. AppTech Corp.*, 2022 WL 4237144, at \*6-7 (S.D.N.Y. Sept. 13, 2022); *Parallax Health Scis., Inc. v. EMA Fin., LLC*, 2022 WL 1446521, at \*14 (S.D.N.Y. Feb. 24, 2022), *adopted as modified*, 2022 WL 2531344 (S.D.N.Y. Apr. 7, 2022); *EMA Fin., LLC v. Joey N.Y. Inc.*, 2022 WL 292920, at \*18 (S.D.N.Y. Feb. 1,

2022); *EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 80-83 (Apr. 18, 2020); *Foundation Ventures, LLC v. F2G, Ltd.*, 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010). Judge Kaplan and the other district courts were correct.

Section "29(b) does not provide a pat legislative formula for solving every case in which a contract and [an alleged] violation concur." *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 421 (2d Cir. 2023) (quoting with approval *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly, J., dissenting, on an issue the majority opinion did not reach)). Rather, it was a "legislative direction" to apply pre-existing "principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction." *Id.* (quoting *Pearlstein*, 429 F.2d at 1149 (Friendly, J., dissenting)). Accordingly, a party cannot simply "enjoy the benefits of a contract and then relieve itself of any obligations under that contract on the sole basis that its counterparty [allegedly] engages in business as a broker-dealer and should have registered with the SEC." *AppTech Corp.*, 2022 WL

15

4237144, at *6.  Whatever the merits of that allegation, it has nothing to do with the "contract," the sole focus of Section 29(b).  15 U.S.C. § 78cc(b).

## A.  Section 29(b) targets unlawful contracts, not the conduct of parties to contracts.

Section 29(b)—entitled "Validity of contracts"—is "centered on *contracts*, not the *conduct* of parties to contracts." *NexPoint*, 80 F.4th at 419.  The district court correctly dismissed Xeriant's claim, which is based (in Xeriant's words) on Auctus's allegedly "prohibited conduct," Xeriant Br. 36, not the "the illegality *of the contract*," *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 105 (2d Cir. 2019) (emphasis added); *see also* App. A-2 (Xeriant failed to show "that *the agreement* [it] seeks to void obligated [Auctus] to act as a dealer" (emphasis added)).)

**1.**  The "contract-centric reading" of Section 29(b) flows directly from the text, and accords with the way this Court and others have interpreted nearly identical "Validity of contracts" provisions in other statutes. *NexPoint*, 80 F.4th at 420.  For instance, in *NexPoint*, this Court considered a "Validity of contracts" provision in the Investment Advisers Act, 15 U.S.C. § 80b-15(b), which "tracks [Section 29(b)] nearly word for word." *NexPoint*, 80 F.4th at 421 (quotation marks omitted).  In ruling that the plaintiff there failed to state a claim, the Court stressed the

16

alleged illegality concerned "conduct *not* required by the contract." *Id.* at 419-20 (emphasis added).

The Court relied on "simila[r] interpret[ations] [of] § 29(b)," in which "district courts in this Circuit" have "authorize[d] rescission *only* when performance of the contract *itself* is unlawful, not merely when the *conduct* of a party to the contract is unlawful." *NexPoint*, 80 F.4th at 421 (first emphasis added).  As Judge Sullivan put it in *Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014)— approvingly cited by *NexPoint*, 80 F.4th at 421—Section 29(b) voids "'unlawful contracts,'" "'not unlawful transactions made pursuant to lawful contracts,'" 2014 WL 3907082, at *4 (quoting *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.), *aff'd*, 672 F.2d 901 (2d Cir. 1981)).

Similarly, in *Oxford University Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99 (2d Cir. 2019), this Court considered the "Validity of contracts" provision in the Investment Company Act, 15 U.S.C. §80a-46(b)—again, similar to Section 29(b).  The Court "repeatedly described" the provision "as applying to *illegal* contracts, rather than to legal contracts performed in an illegal manner." *NexPoint*, 80 F.4th at 420 (discussing *Oxford*); *see, e.g.*, *Oxford*, 933 F.3d at 105 ("[A] party to an illegal contract may seek

17

relief in court on the basis of the illegality *of the contract*." (emphasis added)); *id.* at 106 ("[C]ontracts that violate the ICA are unenforceable by parties to the contract."); *id.* at 109 ("ICA § 47(b)(2) creates an implied private right of action for a party to a contract that violates the ICA to seek rescission of that violative contract."). And, like *NexPoint*, in holding the intervenor did not state a claim, the Court stressed it had "not identified any provision of the [contract] whose performance would violate the [Act]." *Oxford*, 933 F.3d at 109. This holding, *NexPoint* reiterated, "reflect[ed] a commonsense interpretation of [the] statutory language." *NexPoint*, 80 F.4th at 420.

2.    The district court correctly applied the same "commonsense interpretation" here. *NexPoint*, 80 F.4th at 420. Xeriant complains that Auctus engaged in "prohibited conduct," Xeriant Br. 36—that Auctus violated Section 15(a) by operating as "an unregistered dealer," *id.* at 29. But as the district court held, App. A-2—and as Judge Sullivan explained in an identical context—"even if [Auctus] should have registered" "as a 'dealer,'" "nothing" in the contract "require[d] [Auctus] to act" as a "dealer." *ExeLED Holdings*, 2018 WL 6547160, at *5.

18

Xeriant, like the other borrowers to have unsuccessfully brought similar claims, alleges (albeit incorrectly) that a party "act[s] as a securities dealer" merely "by purchasing and selling securities as a regular part of its business." App. A-24 ¶ 86. Even if Xeriant's dealer-registration theory were accurate, the agreement undisputedly does not require Auctus to act as a dealer,[4] because it does not require Auctus to both buy *and sell* securities; Xeriant can point to no provision of the contract that requires Auctus to sell anything. Thus, the contract is "not [a] voidable 'unlawful contrac[t].'" *ExeLED Holdings*, 2018 WL 6547160, at *5 (quoting *Frati v. Saltzstein*, 2011 WL 1002417, at *5 (S.D.N.Y. Mar. 14, 2011)).

---

[4] While Xeriant is incorrect regarding the meaning of "dealer" under the Exchange Act, *see, e.g.*, *Discover Growth Fund, LLC v. Camber Energy, Inc.*, 602 F. Supp. 3d 982, 988 (S.D. Tex. 2022), Auctus did not move to dismiss on this basis, the question was not briefed below, and the district court did not consider this question. Nor does Xeriant brief the issue on appeal. *See* Xeriant Br. 30. The Court therefore need not address it. *See, e.g., Forras v. Andros*, 184 F. App'x 33, 35 (2d Cir. 2006) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.") (quoting *Singleton v. Wulff*, 428 U.S. 106, 120–21 (1976)). Nor does the denial of Auctus's motion to dismiss in *SEC v. Auctus*, No. 23-cv-11233-AK (D. Mass.), resolve the question; that decision merely held that the SEC's allegations had stated a Section 15(a) claim against Auctus, but the ultimate resolution remains very much in dispute.

"For identical reasons," courts in this Circuit have "uniformly rejected" claims similar to Xeriant's "for nearly half a century." *AppTech Corp.*, 2022 WL 4237144, at \*7; *see, e.g.*, *TPT Glob. Tech, Inc.*, 2023 WL 7043227, at \*5 ("Much like the defendant in *Vystar*, the Plaintiff here 'has not indicated any way in which the Agreements . . . require EMA to' register as a broker-dealer."); *Acuitas Cap., LLC v. Ideanomics, Inc.*, 2023 WL 4373314, at \*1 (S.D.N.Y. June 21, 2023) (holding that agreement was "not an inherently unlawful contract subject to rescission" because it "permitted, but did not mandate, [the lender] to sell securities purchased thereunder"); *Cyber Apps World*, 645 F. Supp. 3d 281, 286 (S.D.N.Y. 2022) ("[R]escission pursuant to section 29(b) would only be available here if the contract itself required EMA to register as a broker-dealer."); *Joey N.Y., Inc.*, 2022 WL 292920, at \*18 (The "very clear case law from this District on this precise issue . . . holds that absent language in the agreements requiring [the lender] to register as a broker-dealer," a Section 29(b) claim "cannot succeed."); *Yi v. GTV Media Grp., Inc.*, 2021 WL 2535528, at \*5 (S.D.N.Y. June 18, 2021) ("There are no allegations as to the substance of the . . . Agreement entered into by Plaintiffs from which the Court could conclude that it required Defendants to register as

a broker-dealer."); *Vystar Corp.*, 336 F.R.D. at 81 ("The flaw in Vystar's argument . . . is that it does not identify a provision in the contracts that obligates EMA to act as a broker-dealer."); *ExeLED Holdings*, 2018 WL 6547160, at *5 ("[T]he Court can only conclude that the Contracts were still capable of performance even if [the lender] failed to register as a dealer.").

Simply, the contract here required no illegality. "[T]he judge herself . . . could have been the lender in the transaction," and she "is certainly not registered" as a broker-dealer under Section 15(a). *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020). Non-registered entities make similar investments—think the multi-billion-dollar investment in Bed Bath & Beyond[5]—all the time. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 94 (2d Cir. 2007) (non-dealer making similar investment); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 197-98 (3d Cir. 2006) (same); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 195 (3d Cir. 2001) (same). Xeriant's CFO *himself* funded the company with a convertible loan. *See supra* p.

---

[5] Anna Mutoh, *Bed Bath & Beyond's $1 Billion Stock Deal: What to Know*, Wall St. J. (Feb. 15, 2023), https://shorturl.at/UY5Jx.

21

6.   In sum, Auctus's contract is "valid."   *AppTech Corp.*, 2022 WL 4237144, at *7.  And Xeriant "cannot avoid its obligations under [that contract] on the basis that [Auctus] should have registered."  *Id.*

## B.   Xeriant's contrary arguments are unavailing.

Xeriant's appellate counsel claims to have found in Section 29(b) an expansive, novel reading that Xeriant's counsel below—and every court to consider the issue before today—has supposedly missed.  But Xeriant's new argument is waived and, in any event, wrong.

### 1.   Xeriant's new "made in violation" theory is waived.

"The law in this Circuit is clear that where a party has shifted [its] position on appeal and advances arguments available but not pressed below, . . . waiver will bar raising the issue on appeal."  *Wal–Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 124 n. 29 (2d Cir. 2005) (quotation marks omitted).  On appeal, Xeriant focuses on three words from the statute—"made in violation."  Xeriant Br. 6, 7, 22, 23, 25, 26, 28. According to Xeriant, Section 29(b) "is not restricted to contracts requiring unlawful performance—it also voids contracts 'made in violation' of the Exchange Act, which is what Xeriant has alleged in this case."  *Id.* at 22.  But that is *not* the argument Xeriant "raise[d] . . . in the

District Court," and thus, this Court need "not consider [it]." *United States v. Wasylyshyn*, 979 F.3d 165, 172 (2d Cir. 2020).

Below, Xeriant maintained "[t]he issue here" is that "Auctus's activities implicate[d] the provision of 15 U.S.C. § 78cc(b) which prohibits []contracts which allow the 'continuance of any . . . practice in violation' of the Act." Supp. App. 34 (ellipsis in original). Xeriant's opposition brief bolded this "**continuance of any relationship or practice**" language for emphasis, and stressed that "*[t]his* part of 15 U.S.C. § 78cc(b) was" key to its theory. *Id.* (italics added); *see also, e.g.*, *id.* at A-32 ("Xeriant seeks to set aside the securities purchase agreement and convertible note as void under Section 29(b) . . . on the grounds that Auctus is utilizing the Agreements *in its practice* as a Lender . . . *to further its practice*" which contravenes Federal Securities Law[.]" (emphases added)); *id.* at A-35 ("[t]he Auctus convertible note agreements underlines a 'practice' . . . without registering as a broker dealer [sic] in violation of Section 29(b)")).

But now, on appeal, Xeriant argues—bolding a *different* part of Section 29(b)—that "the contract in this case" was "**made in violation**" of the Exchange Act. Xeriant Br. 7; *see also, e.g.*, *id.* ("The problem: The SDNY formulation arbitrarily excises" language regarding "those

contracts ***made in violation of the Act***."); *id.* at 22 ("Xeriant has alleged" Section 29(b) "voids contracts 'made in violation' of the Exchange Act"); *id.* at 28 ("[t]he best example of a § 29(b) voiding [of] a contract 'made in violation' of the broker-dealer registration requirement").

Xeriant cannot avoid the district court's adverse judgment by "chang[ing] horses in mid-stream." *Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 19 (1st Cir. 2021) (quotation marks omitted); *see also, e.g., Wasylyshyn*, 979 F.3d at 172 ("We do not reach this argument, however, because Wasylyshyn did not raise it in the District Court. As a general rule, we will not consider arguments first raised on appeal to this court."); *Joseph v. Ocwen Fin. Corp.*, 2023 WL 3635077, at \*1 n.1 (2d Cir. May 25, 2023) (summary order) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." (quotation omitted)); *Grullon v. Delta Air Lines, Inc.*, 2021 WL 6116784, at \*3 (2d Cir. Dec. 27, 2021) (summary order) ("This argument was not raised before the District Court, and we need not entertain it.").

Xeriant, to be sure, fired its district-court counsel because it "disagree[d]" with him on the "legal position proffered," ECF No. 17.2 at 1, but that is no *defense* of Xeriant raising a new argument on appeal; it's

24

a confession. Xeriant "voluntarily chose [its] attorney as [its] representative in the action, and [it] cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962). If Xeriant "disagree[d]" with its agent's "legal position," ECF No. 17.2 at 1, it should have said so below, not kept its powder dry until appeal. Xeriant's papers below "exclusively addressed" the continuance-of-any-relationship theory, so this Court need not "entertain" the "different," made-in-violation theory pressed for the first time now. *United States v. Mendonca*, 88 F.4th 144, 165 (2d Cir. 2023).

### 2. Xeriant is wrong in any event.

**a.** Even if this Court were to consider Xeriant's new-found argument, Xeriant's distinction between contracts "made in violation" and "performed in violation" of the Exchange Act is meritless. Xeriant Br. 25–27. As Judge Friendly recognized a half-century ago—and as this Court reiterated just last year—"[d]espite" at times "Draconian" sounding language, Section 29(b) "does not provide a pat legislative formula for solving every case in which a contract and a violation concur." *Pearlstein*, 429 F.2d at 1149 (Friendly, J., dissenting, on an issue the

25

majority opinion did not reach); *see NexPoint*, 80 F.4th at 421. Rather, Section 29(b) was a "legislative direction" to apply pre-existing "principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction." *NexPoint*, 80 F.4th at 421 (quoting *Pearlstein*, 429 F.2d at 1149 (Friendly, J., dissenting)).

"The Fourth Circuit has expressly endorsed this position." *NexPoint*, 80 F.4th at 421; *see Occidental Life Ins. Co. v. Pat Ryan & Assocs., Inc.*, 496 F.2d 1255, 1266 (4th Cir. 1974) ("Section 29(b) merely makes explicit that which is implicit, i.e., the recognition of the doctrine of illegal bargains in the application of the securities laws."). And the "Third Circuit has taken a similar approach." *NexPoint*, 80 F.4th at 421; *see Berckeley*, 455 F.3d at 206.

Thus, as this Court explained in *NexPoint*, Section 29(b) "authorize[s] rescission only when performance of the contract *itself* is unlawful, not merely when the *conduct* of a party to the contract is unlawful." 80 F.4th at 421. *NexPoint* cited "collect[ed] cases," *id.*, in *Omega*, 2014 WL 3907082, at *4, which includes *Drasner v. Thomson McKinnon Securities, Inc.*, 433 F. Supp. 485 (S.D.N.Y. 1977). *Drasner*

26

confirms the point: Section 29(b) "only renders void those contracts which by their terms violate the Act . . . for it is *only* such contracts which are 'made in violation of,' or 'the performance of which involves the violation of' the statute." *Id.* at 501–02 (emphasis added).

As discussed, Xeriant's claim fails precisely because the contract by its terms does not require Auctus to take any action that allegedly violates the Exchange Act because it does not require Auctus to sell anything or otherwise "act as a [dealer]." *ExeLED Holdings*, 2018 WL 6547160, at *5; *see also supra* pp. 16–22.

**b.**    Casting precedent aside, Xeriant nevertheless argues that the loan agreement is "void" because Auctus "made" the agreement while in the "status [of] an unregistered dealer (in violation of §15(a))." Xeriant Br. 21. This argument is circular. As discussed, it is undisputed that non-registered entities can—and do—loan money to public companies similar to Auctus's loans all of the time. *Supra* p. 21. Citing a FINRA rule that on its face does not apply to Auctus's loan,[6] Xeriant theorizes

---

[6] Xeriant states that FINRA Rule 5110 would prevent a registered "dealer" from engaging in "the [supposedly] abusive loan arrangements and enormous profit margins." Xeriant Br. 4. This argument is frivolous. On its face, FINRA Rule 5110 applies only to "public offerings," which are

that Auctus becomes a securities "dealer" because it purportedly "sells the stock as quickly as possible to reap the 'spread' between the discount and the market price.'" Xeriant Br. 4. But, again, even if that were true—despite not being alleged in the Complaint or otherwise appearing in the record—that has nothing to do with the contract. Xeriant does not, and cannot, allege that Auctus has ever entered *any* contract, let alone a contract with Xeriant, that *required* Auctus to sell any stock to anyone.

Xeriant cites (at 25) *Berckeley v. Colkitt*, 455 F.3d 195 (3d Cir. 2006), but *Berckeley rejected* a claim almost identical to Xeriant's. There, the borrower tried a similar gambit to escape its loan obligations—it alleged not that the lender was an unregistered *dealer*, but that the *shares* the lender received and sold were unregistered. *Id.* at 207. The court, however, rejected that argument, holding that the "downstream sales were tangential to the parties' basic obligations under the Agreement: Berckeley's obligation to loan Colkitt $2,000,000 and

---

defined as *excluding* transactions exempt under Section 4(1) of the Securities Act of 1933. FINRA Rule 5110(j)(18). As Xeriant concedes, Auctus acquired stock under Rule 144. Xeriant Br. 32. Rule 144 implements Section 4(1). *See* 17 C.F.R. § 230.144. Thus, Rule 144-compliant transactions are not subject to FINRA Rule 5110.

28

Colkitt's obligation to provide Berckeley with convertible debentures." *Id.* at 206-07. So too here. Xeriant complains that Auctus's *sale* of converted stock into the market is "dealer" activity, *see, e.g.,* App. A-11 ¶¶ 9, 11; *id.* at A-23 ¶ 84 but whether that is true or not, those sales are not to Xeriant and are not required by the Agreement.

*Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968), proves the point. Xeriant cites *Eastside Church* as "[t]he best example of a § 29(b) voiding [of] a contract 'made in violation' of the broker-dealer registration requirement of § 15(a)." Xeriant Br. 28. But in *Eastside Church*, unlike here, the purported dealer (National Plan) was *contractually required* to sell the stock. It was not "acting solely in the capacity of an arm's length purchaser," as Xeriant acknowledged with respect to Auctus here. App. A-80. Rather, National Plan's "principal business" was to "put on bond issues to build churches." 391 F.2d at 361 (quotation marks omitted). National Plan, in other words, was contractually bound to acquire bonds from the churches, "assis[t] the church in doing all of the legal work concerning the bond program, [take] care of necessary printing, handl[e] all of the paper work in connection with the bond issue, ac[t] as fiscal agent and trustee of the property, and

direc[t] the bond sales program" by making "sales . . . throughout the country." *Id.* Xeriant did not agree to any such terms or any such role for Auctus here—terms that required National Plan to act as a "dealer."

Indeed, *every* appellate decision to void an agreement under Section 29(b) for an alleged broker-dealer-registration violation has similarly involved broker or dealer conduct that was, unlike here, "inseparable from the contract's central purpose*." EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 61 (1st Cir. 2021). In both *EdgePoint* and *Regional Properties*, the putative broker-dealer was hired for the explicit purpose of performing brokerage services. *EdgePoint*, 6 F.4th at 52-53; *Reg'l Props., Inc. v. Fin. & Real Est. Consulting Co.*, 678 F.2d 552, 554 (5th Cir. 1982). As this Court put it in *NexPoint*, "[i]n each [case], a party was contractually required to solicit securities sales on behalf of others"—provisions that required a party to engage in brokerage conduct that was unlawful in light of their nonregistration as brokers. 80 F.4th at 421. Xeriant identifies no similar requirement here.

**c.** Xeriant's brief gives the game away when it acknowledges that, "[b]ecause § 15(a) itself does not allow a private right of action, claimants [have] sought to void the notes or warrants under § 29(b)."

Xeriant Br. 6. This is the exact workaround this Court rejected in *NexPoint*. Just as, there, Congress declined to create a private right of action under Section 206 of the Advisers Act, 80 F.4th at 419–20, here, Congress declined to create a private right of action under Section 15 of the Exchange Act, *see, e.g.*, *Asch v. Philips, Appel & Walden, Inc.*, 867 F.2d 776, 777 (2d Cir. 1989) (Section 15(c)); *Brannan v. Eisenstein*, 804 F.2d 1041, 1043 n.1. (8th Cir. 1986) (Section 15(a)); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1314 (9th Cir. 1982) (Section 15(a)); *Goodman v. Shearson Lehman Bros., Inc.*, 698 F. Supp. 1078, 1083 (S.D.N.Y. 1988) (Walker, J.) (Section 15(a)). Section 29(b) is not "'a backdoor to the private right of action'" Congress declined to create. *NexPoint*, 80 F.4th at 420 (quoting *Omega*, 2014 WL 3907082, at \*2). Yet as in *NexPoint*, "permitting claims . . . based solely on conduct not required by the contract," as Xeriant advocates here, would do exactly that. *Id.* at 419–20.

**d.** Xeriant's assumption that Section 29(b) implies a private right of action for Xeriant's benefit also is mistaken. This Court implies causes of action only for those in the class for whose "'especial benefit'" the securities laws were enacted. *Bennett v. U.S. Tr. Co. of N.Y.*, 770 F.2d

31

308, 312 (2d Cir. 1985).  Whatever the precise contours of the "dealer" definition, there can be no dispute that Section 15(a) and broker-dealer registration were created for the "especial benefit" of *customers* of broker-dealers, for whom the broker-dealer acts.  *See, e.g.*, *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020) ("Broker-dealers effect securities transactions for customers[.]"); *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) ("The interlocking requirements of registration and supervision act to ensure that 'securities are [only] sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells.'").  49 Fed. Reg. 20,512, 20,512 & n.4 (SEC May 15, 1984) ("Registered broker-dealers are subject to a comprehensive regulatory scheme designed to ensure that customers are treated fairly[.]").  Section 15(a) was not created for the "especial benefit" of publicly traded corporations, represented by their *own* registered broker-dealers, *Bennett*, 770 F.2d at 312, who solicit and receive loans for millions of dollars, simply to allow them to walk away, for no conceivable regulatory reason, at their choosing.

32

In fact, "allowing a private cause of action" in these circumstances would "encourage violations." *Bennett*, 770 F.2d at 312. Opportunistic borrowers "seeking to shift the risk of loss," *id.*, such as Xeriant, would be incentivized to solicit loans, borrow millions of dollars, and then, if convenient, walk away from the deal by alleging that the lender is allegedly a securities "dealer." Section 29(b) was not designed to allow borrowers to "use the threat of a hypothetical SEC action to vitiate" loans in this way. *ExeLED Holdings*, 2018 WL 6547160, at *5; cf. *Bassler v. Cent. Nat. Bank in Chicago*, 715 F.2d 308, 313 (7th Cir. 1983) ("We conclude that neither § 7(d), § 29(b), § 27 nor any other provision of the Securities Exchange Act of 1934, read separately or in the context of the entire Act, implies that the Act was intended by Congress to confer a right of action upon investment borrowers as against investment lenders.").

e. In any event, to rescind a contract under Section 29(b), a party must be "an unwilling innocent party to the contract." *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757, 759 (2d Cir. 1983). Xeriant is anything but. It is not a victim of fraud or deceit. *Cf. Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) (cited at Xeriant Br. 25). As in *Buffalo Forge*, Xeriant

33

"willingly entered into the questioned contract and knew of all the facts" that form the basis of the alleged violation. *Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 892, 906 (W.D.N.Y. 1983), *aff'd*, 717 F.2d 757 (2d Cir. 1983); *see Buffalo Forge*, 717 F.2d at 759 ("We affirm" the holding that "Ampco did not have standing to rescind the sales under section 29(b) . . . because neither it nor Buffalo Forge was an unwilling innocent party.").

As Xeriant admits, "Auctus'[s] broker-dealer registration [status] could be easily found," Supp. App. 31; it's a matter of public record, *supra* p. 8. Moreover, Xeriant's "fiduciary agent," Supp. App. 32, Maxim, through whom Xeriant "executed" the transaction, App. A-15 ¶ 33, knew—the complaint itself admits—that Auctus "actively" provided convertible loans "to would be borrowers." App. A-14 ¶ 29. Auctus's convertible loans were also a matter of public record, disclosed in numerous public filings accessible on the SEC's EDGAR website at the time of the Agreement. *See supra* p. 7–8. And Xeriant was intimately familiar with how convertible loans worked—Xeriant's own CFO provided Xeriant with a convertible loan before Auctus did. *See supra* p. 6. Xeriant was not unwilling or innocent; nor has it alleged as much.

Section 29(b) does not, in these circumstances, permit Xeriant to borrow—and spend—millions of dollars to grow its business, *supra* p. 8, with the option simply to walk away and pocket a windfall if and when it chooses. *Cf. NFusz*, 509 F. Supp. 3d at 36 ("having presumably benefitted from borrowing money from EMA, nonetheless NFusz wants to rescind the Agreements in their entirety"; refusing to "provide [such] a windfall"); *Cary Oil Co. v. MG Refin. & Mktg., Inc.*, 230 F. Supp. 2d 439, 486 (S.D.N.Y. 2002) ("[T]here is no claim that the contract was entered into because of any misrepresentations.  Hence it would be too glib to talk about an 'innocent party,' at whose option the contract is voidable.").

## II.    In any event, Xeriant's claim is time-barred.

This Court can "affirm on any ground that finds support in the record." *Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir. 1995).  Xeriant's claim—filed *two years* after the contract was executed—is plainly barred by the *one-year* statute of limitations.

### A.    In *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024), this Court held that "claims for recission under Section 29(b) expire one year after they accrue." *Id.* at 143; *see also Kahn v. Kohlberg, Kravis, Roberts & Co.* (*KKR*), 970 F.2d 1030, 1039 (2d Cir. 1992) (same for "parallel" provision

35

in Advisers Act).  The parties agree that Xeriant's claim accrued when it knew "or with due diligence should [have] know[n] [the] facts that . . . form the basis for [its] action." *Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010) (emphasis and quotation marks omitted); *see KKR*, 970 F.2d at 1042 (same for Advisers Act); Supp. App. 31 (conceding that "one-year period commences . . . when a hypothetical reasonably diligent plaintiff would have discovered [the facts]").  Such accrual occurred on October 27, 2021, the day Xeriant executed the agreement.  At that point, Xeriant knew or could have easily discovered the facts underlying its Section 29(b) claim.  Xeriant's October 2023 complaint, filed two years later, was thus a year too late.

Everyone agrees that on October 27, 2021—the day Xeriant signed the Agreement—Xeriant could easily have discovered that Auctus was not registered as a dealer with the SEC by "looking at the [FINRA] website" (https://brokercheck.finra.org/), which lists every registered dealer.  *Weiss v. Altholtz*, 2011 WL 4538459, at *2 (N.D. Ill. Sept. 29, 2011).  Xeriant conceded as much.  *See* Supp. App. 31 (acknowledging that "Auctus' broker-dealer registration could be easily found (per defendants argument)")).  The district court so held.  *See* App. A-1

(Xeriant "knew, at least constructively, that the defendant was not a *registered* dealer at the time the parties contracted"). And every court to consider the question in these same circumstances has come to the same conclusion, including a unanimous panel of the Ninth Circuit just last year. *See Social Life Network, Inc. v. LGH Invs., LLC*, 2023 WL 3641791, at *1 (9th Cir. May 25, 2023) (on the date the borrower executed the loan agreement, it "could have determined with reasonable diligence that LGH was not a registered securities dealer, which was a matter of public record"). As this Court put it in *KKR* in assessing a nearly identical "unregistered adviser" claim under the Advisers Act, "[t]he fact that [the defendant] had not registered was a matter of public record" and thus "obviously known" by the plaintiff. 970 F.2d at 1042.

Thus, the only dispute is whether Xeriant knew, or should have known with reasonable diligence, that Auctus engaged in the transactions—convertible lending—that Xeriant alleges constitutes dealer activity. *See* App. A-11 ¶¶ 8-11. The answer is clearly yes. As in *KKR*, which affirmed a statute of limitations dismissal, Xeriant itself "admits that [the defendant] was notorious for doing deals like the one" at issue. 970 F.2d at 1042. The complaint alleges that this was Auctus'

37

"primary line of business." App. A-11 ¶ 8; *see also id.* ("Over the years, Auctus . . . routinely obtained discounted shares of stock by entering into hundreds of convertible debt financing agreements with penny stock companies in need of cash . . . ."). And Xeriant's own brief acknowledges that Auctus's lending was "prolific." Xeriant Br. 9 n.3. Indeed, the brief cites *53 civil cases* Auctus publicly filed in federal court to enforce identical loans. *Id.* at 9. And, of course, Auctus's loans are, like its registration status, matters of public record anyway.

At the time the Agreement was executed, a simple search of the SEC's EDGAR database at https://sec.gov/edgar would have revealed numerous public company filings related to Auctus's convertible loans. *See supra* p. 8 n.2. As a public company that regularly files documents with the SEC, Xeriant undoubtedly was familiar with the SEC's EDGAR database, which records all such public filings. *See* EDGAR Search Results for Xeriant, Inc., Secs. & Exch. Comm'n, https://tinyurl.com/439d36vv (listing each of Xeriant's public SEC filings). Xeriant, moreover, was intimately familiar with convertible loans at the time it entered into the Agreement—it had previously received one from Xeriant's own CFO. *See supra* p. 6.

There can simply be no doubt that Xeriant itself knew or should have known on October 27, 2021 of Auctus's convertible lending that allegedly required it to register as a dealer. *KKR* compels this conclusion. As noted, *KKR* concerned a similar "rescission" claim under a "parallel" provision in the Investment Advisers Act. 970 F.2d at 1039. Plaintiffs in that case sought to rescind an agreement with KKR on the ground that KKR had "failed to register as an investment adviser." *Id.* at 1032. But this Court found that plaintiffs "knew or should have known the basis for [their] claims … at the time … [the] agreements were executed." *Id.* at 1042. Just as in this case, KKR's registration status "was a matter of public record," and information about its transactions was publicly available. *Id.* This Court held that those facts "compelled" a finding that the one-year-from-discovery clock had started to run. *Id.* Xeriant does not, and cannot, explain why this Court should reach a different judgment here, nor why this Court should create a circuit split with the Ninth Circuit on an identical issue, *see Social Life Network*, 2023 WL 3641791, at *1.

Xeriant, in fact, admits that its own agent was aware of Auctus's convertible lending. That knowledge is imputed to Xeriant. Xeriant

39

concedes that Maxim was its "trusted fiduciary agent" to "help facilitate the sourcing of funds" from Auctus for Xeriant's joint venture. Supp. App. 32; App. A-14 ¶ 25; *see also* App. A-14 ¶ 27 (alleging it "relied" on "Maxim to guide, counsel and help shepherd its executives on how to source the best funding to help Xeriant achieve its desired end goal of acquiring [the aircraft company]"). It is blackletter law that an agent's knowledge is imputed to its principal. *See, e.g., Rai v. WB Imico Lexington Fee, LLC*, 802 F.3d 353, 360 (2d Cir. 2015) ("notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal") (cleaned up); *N.Y.U. v. First Fin. Ins. Co.*, 322 F.3d 750, 753 n.2 (2d Cir. 2003) ("knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it") (quotation marks omitted); *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999) ("the agent's knowledge is imputed to the principal."). The Complaint alleges that, at the time of the Agreement, Maxim was already familiar with Auctus and its ability to provide convertible loans to companies needing financing. App. A-14 ¶ 29 ("In 2021, at the time of Xeriant's need

for funding, Auctus was actively extending its convertible loan products to would be borrowers through Maxim.").  Maxim, and therefore its principal Xeriant, undisputedly knew of Auctus's "activ[e]" convertible lending—*i.e.*, the very activity that Xeriant alleges required registration–on the day Xeriant executed the Agreement.  *Id.*  Xeriant thus undoubtedly knew or should have known on October 27, 2021 the facts underlying its Section 29(b) claim.

Every court in the country to consider this same issue, other than the decision below, has held that "the plaintiffs knew or should have known the basis for the [rescission] claims at least at the time that the . . . agreements were executed." *KKR*, 970 F.2d at 1042; *see, e.g.*, *LGH Invs.*, 2023 WL 3641791, at *1 (affirming dismissal of Section 29(b) claim "brought more than a year" after defendant "executed its loan agreement" as "time-barred" where plaintiff "could have determined with reasonable diligence that [defendant] was not a registered securities dealer, which was a matter of public record"); *Social Life Network, Inc. v. Peak One Opportunity Fund, L.P.*, 2023 WL 2838095, at *5 (S.D. Fla. Feb. 13, 2023) (recommending dismissal of Section 29(b) claim based on alleged dealer registration violation as time-barred where "[a]t the time of contracting,

[plaintiff] could have discovered with minimal diligence that the Fund was not registered in accordance with Section 15(a)"), *report and recommendation adopted in relevant part, rejected in part*, 2023 WL 2445174, at *2 (S.D. Fla. Mar. 10, 2023) (dismissing as time-barred because "there is no question that a reasonably diligent plaintiff should have known the facts underlying the…Complaint—including whether the [defendant] was a dealer and whether it was registered—when Plaintiff executed the agreements").

Xeriant argued below that while it may have been aware of the activities that made Auctus a dealer, it was not aware of the "legal" significance of those activities until some time later. Supp. App. 31. Time and again, courts have rejected that argument. It is the "discovery of the facts constituting the violation," *Merck*, 559 U.S. at 634 (quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991)), that "starts the one-year period of limitations, not the discovery that there was a violation," *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 948 (N.D. Ill. 2001) (cleaned up). *See also, e.g.*, *KKR,* 970 F.2d at 1042 ("the *facts* giving rise to a claim to rescind" a contract start the "one year" clock (emphasis added)); *Alpha Cap. Anstalt v. Oxysure*

*Sys., Inc.*, 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016) (barring Section 29(b) defense where party knew relevant facts because "ignorance of [broker-dealer registration] law alone does not toll statutes of limitations") (cleaned up); *Peak One*, 2023 WL 2445174, at *2 (dismissing Section 29(b) claim because "[i]t is the discovery of the facts constituting the violation that starts the clock, not the discovery that there was a violation" (quotation marks omitted)). So to the extent Xeriant claims the limitation period only began to run once the SEC filed enforcement actions against convertible lenders predicated on the Section 15(a) theory Xeriant now adopts, that argument must fail. *See de la Fuente v. DCI Telecomms., Inc.*, 206 F.R.D. 369, 383 (S.D.N.Y. 2002) ("SEC lawsuits are by no means a necessary trigger for inquiry notice").[7]

---

[7] Xeriant did not argue below, and the district court did not find, that the continuing violation doctrine is applicable here. Nor would any such argument have merit. That doctrine only applies to conduct that "may give rise to damages in the future which are not predictable at the time of the initial act or within the limitations period." *KKR*, 970 F.2d at 1039. Here, Auctus's future "conversions were foreseeable to [Xeriant] at the times the parties" executed the Agreement; in fact, Xeriant "expressly agreed to permit [Auctus] to elect that option." *FirstFire*, 2023 WL 199196, at *10; *see* App. A-53 (providing that loan is "convertible into shares of Common Stock"). Moreover, Xeriant's "Exchange Act claim is not based on" Auctus later converting the loan into stock, "but on the singular event of [Auctus] allegedly entering an unlawful contract." *LGH*

43

The Court should affirm the judgment of dismissal because Xeriant's Exchange Act claim is time-barred.

## CONCLUSION

This Court should affirm the district court's judgment granting the motion to dismiss.


Dated:  July 24, 2024                    Respectfully submitted,

                                         */s/ Marshall R. King*

Brian Richman                            Marshall R. King
GIBSON, DUNN & CRUTCHER LLP              M. Jonathan Seibald
2001 Ross Avenue                         GIBSON, DUNN & CRUTCHER LLP
Dallas, TX 75201                         200 Park Avenue
(214) 698-3466                           New York, NY 10166
                                         (212) 351-4000


*Counsel for Defendant–Appellee*

---

*Invs.*, 2023 WL 3641791, at *1 (holding that "limitations period began to run" when the loan was executed "and the continuing violations doctrine does not apply").

## CERTIFICATE OF COMPLIANCE

1.　　This brief complies with the word limitation of Local Rule 32.1(a)(4)(A) because it contains 9,237 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.　　This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point.

Dated:　July 24, 2024　　　　　　　　　_/s/ Marshall R. King_