24-682-cv
*Xeriant, Inc. v. Auctus Fund LLC*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2024

(Argued: October 22, 2024     Decided: June 25, 2025)

Docket No. 24-682-cv

XERIANT, INC.,

*Plaintiff-Appellant,*

*- against -*

AUCTUS FUND LLC,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

WESLEY, CHIN, and KAHN, *Circuit Judges.*

Appeal from a decision of the United States District Court for the

Southern District of New York (Kaplan, *J.*), granting defendant-appellee's motion

pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss plaintiff-appellant's claim for

rescission of the parties' securities purchase agreement pursuant to Section 29(b)

of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc, and its analogous state

law claims.  The district court held that the parties' agreement was not void

because, although defendant-appellee failed to register as a dealer with the

Securities and Exchange Commission, the contract did not *obligate* the defendant-

appellee to act as a dealer.  We agree that plaintiff-appellant has failed to allege a

sufficient claim for rescission under Section 29(b) and, accordingly, affirm the

decision of the district court.

AFFIRMED.

_____

MARJORIE SANTELLI (Mark R. Basile, *on the brief*), The
  Basile Law Firm, P.C., Jericho, NY, *for Plaintiff-*
  *Appellant*.

M. JONATHAN SEIBALD (Marshall R. King and Brian
  Richman, *on the brief*), Gibson, Dunn & Crutcher
  LLP, New York, NY, and Dallas, TX, *for*
  *Defendant-Appellee*.

_____

CHIN, *Circuit Judge*:

This case involves a claim for rescission of a securities purchase

agreement between plaintiff-appellant Xeriant, Inc. ("Xeriant") and defendant-

appellee Auctus Fund, LLC ("Auctus"). In 2021, Xeriant, an aerospace company, sought financing from investors to fund a joint venture with another company. Xeriant eventually connected with Auctus, a hedge fund that routinely invests in convertible debt financing agreements with microcap companies. Auctus agreed to lend approximately $5 million to Xeriant through a convertible promissory note, *i.e.*, if Xeriant failed to repay the loan on a timely basis in cash, Auctus could convert the amount due into shares of common stock at a set price. Nothing in the parties' agreement required Auctus to then sell any converted shares on the market.

When Xeriant failed to pay back the loan, Auctus sought to collect by converting Xeriant's debt into common stock. Xeriant rejected the conversion request and instead filed this lawsuit against Auctus, seeking a declaratory judgment to void the parties' contract under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78cc. Xeriant claimed that the agreement was void under Section 29(b) of the Exchange Act because Auctus was not a registered securities dealer as required by Section 15(a)(1) of the Exchange Act, and was therefore not lawfully permitted to effectuate the securities transactions

set forth in the agreement. The district court (Kaplan, *J.*) granted Auctus's motion to dismiss the complaint.

Although Section 15(a) indeed prohibits unregistered dealers from buying and selling securities in interstate commerce, it is the Securities and Exchange Commission (the "SEC"), rather than private parties, that enforces the provision. A party bringing a private right of action under the Exchange Act is instead limited to Section 29(b), which permits only the rescission of unlawful contracts, not lawful contracts from which unlawful transactions are made. We conclude here that the parties' agreement cannot not be voided under Section 29(b) because it did not *obligate* Auctus to act as a dealer in violation of the Exchange Act. For the reasons set forth below, we AFFIRM the decision of the district court.

## BACKGROUND

### I.    *The Facts*

On appeal from an order granting a motion to dismiss, the facts alleged in the complaint are accepted as true. *See Salazar v. King*, 822 F.3d 61, 68 n.5 (2d Cir. 2016). The following facts are drawn from Xeriant's complaint, the

exhibits attached thereto, and documents incorporated by reference therein.  *See In re: Nine W. Sec. Litig.*, 87 F.4th 130, 140 (2d Cir. 2023).

### A.       *The Contract*

Xeriant is a publicly traded aerospace and technology company that focuses on "acquiring, developing[,] and commercializing sustainable advanced materials and technology related to next generation air and spacecraft."  App'x at 13.  In or about August 2021, Xeriant sought financing to fund a joint venture with -- and eventual acquisition of -- another aircraft manufacturer.  Xeriant requested that its investment bank, Maxim Group LLC ("Maxim"), find an investment source to fund the acquisition. [1]  Maxim arranged a meeting between Xeriant and Auctus, a hedge fund that provides "convertible debt financing to public companies 'in need of cash.'"  Supp. App'x at 8**.**  Auctus provides that type of financing by purchasing convertible promissory notes and stock purchase warrants that it can execute in the event of nonpayment by the debtor.  Auctus is not a registered securities dealer.

---

[1]       In addition to providing financial advice to its clients, Maxim works with "many microcap publicly traded companies (*i.e.,* 'penny stocks') on public offerings, up listings, and on the facilitation of structured debt financing."  App'x at 14.

The parties met in New York to discuss the terms of the proposed loan.  **[A15]**.  On October 27, 2021, Xeriant and Auctus entered into a convertible loan agreement, which included, *inter alia*, a stock purchase agreement (the "SPA"), the contract at the heart of Xeriant's Section 29(b) claim.  Pursuant to the SPA, Auctus loaned Xeriant $5,142,500 by purchasing a convertible promissory note in the amount of $6,050,000, which Xeriant was required to pay back within one year in either cash or stock.  The stock option allowed repayment through a stock purchase warrant for 50,968,822 shares of Xeriant stock at a price of $0.12 cents per share. [2]  Nothing in the SPA required Auctus to sell any converted shares it acquired in the event of non-payment.

In accordance with the SPA, Auctus advanced $5,142,500 to Xeriant.  When Xeriant was unable to pay the loan at the maturity date, the parties twice amended the SPA to extend the deadline.  In exchange for the extensions, Xeriant granted Auctus stock purchase warrants to acquire 275,000,000 additional shares of Xeriant common stock at $.09 per share, and paid $200,000 in cash to Auctus.  The due date for repayment of the loan was extended to March 15, 2023.

---

[2]     A warrant, like a stock option, grants the warrant holder the right to buy stock of the company at a certain price for a period of time.  Richard A. Booth, *Rights and Warrants*, Financing the Corporation § 3:8.

- 6 -

Xeriant failed to pay the loan. On October 6, 2023, nearly seven months after the second extended deadline, Auctus sought to convert the debt into stock as permitted by the SPA. Xeriant refused to approve the request, and instead sued Auctus, challenging the validity of the SPA.

**B.** *The SEC Suit Against Auctus*

Xeriant refused Auctus's attempt to convert the loan in part due to pending litigation brought by the SEC against Auctus arising from other transactions. *See SEC v. Auctus Fund Mgmt., LLC*, No. 23-CV-11233, 2024 WL 3498593, at *1 (D. Mass. July 22, 2024). In June 2023, the SEC brought an enforcement action against Auctus for engaging in securities transactions as an unregistered dealer in violation of Section 15(a) of the Exchange Act. *Id.* ("This case is part of a raft of cases brought by the [SEC] alleging that individuals and entities whose business it is to buy and sell shares of securities pursuant to convertible loan agreements are securities 'dealers' and must be registered as such with the Commission."). The SEC alleged that between 2013 and 2021, Auctus entered into more than 100 contracts similar to that in the instant case, exercising its conversion rights to obtain more than 60 billion shares of stock that it subsequently sold in the market to reap over $100 million in profits. *See id.* at

*2, *5.  The SEC submitted that Auctus's business practices -- particularly the volume and form of its lending of funds to microcap companies -- demonstrated that it operates as a securities dealer and is subject to the Exchange Act's registration requirement.  *Id.* at *4-5.

Auctus moved to dismiss the SEC action for failure to state a claim. *Id.* at *1.  The district court denied the motion to dismiss and held that the SEC's allegations were sufficient to state a claim under Section 15(a) of the Exchange Act.  *Id.* at *7.  That litigation is ongoing.

## II.    *Procedural History*

On October 19, 2023, Xeriant filed this action against Auctus in the Southern District of New York.  Xeriant sought a declaratory judgment to rescind the contract, alleging, *inter alia*, that the SPA was void under Section 29(b) of the Exchange Act because Auctus acted as an unregistered securities dealer in violation of Section 15(a)(1) and was not lawfully permitted to effectuate the securities transactions outlined in the SPA.[3]  Auctus moved to dismiss the

---

[3]    Xeriant alleged five claims: (1) a declaratory judgment to void the SPA under the Exchange Act; (2) a declaratory judgment to void the SPA under the Massachusetts Uniform Securities Act; (3) a declaratory judgment to void the SPA for criminal usury under Massachusetts state law; (4) a declaratory judgment to void the SPA under New York state law; and (5) breach of the implied covenant of good faith and fair dealing.

complaint on the grounds that (1) Xeriant' s Section 29(b) claim was time-barred and (2) the SPA was not void under the Exchange Act because it did not require Auctus to transact securities or otherwise act as a dealer.

On February 9, 2024, the district court granted Auctus's motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), concluding that Xeriant's complaint, although timely filed, failed to plausibly assert a claim for relief because it failed to allege that the SPA obligated Auctus to act as a dealer.[4] This appeal followed.[5]

---

[4] Because Xeriant failed to defend the sufficiency of its state law claims in response to Auctus's motion to dismiss, the district court dismissed Xeriant's remaining claims.

[5] The district court originally filed an order and accompanying judgment dismissing the case on January 9, 2024. The district court then vacated that order on January 22, 2024, and filed a new order on February 9, 2024, but did not enter a new judgment. Hence, the district court did not enter judgment in a separate document, as required by Federal Rule of Civil Procedure 58(a). That oversight, however, "does not affect the validity of an appeal from that judgment or order." Fed R. App. P. 4(a)(7)(B). Where no separate document has been filed, we consider judgments entered after "150 days have run from the entry in the civil docket" of the order at issue. Fed. R. Civ. P. 58(c)(2)(B); *see Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006). We similarly treat a notice of appeal filed by that date to be timely. *See* Fed. R. App. P. 4(a)(2). Moreover, "the separate document rule is deemed to have been waived and the assumption of appellate jurisdiction is proper" when (1) "an order appealed from clearly represents a final decision," and (2) "the appellee[] do[es] not object to the taking of an appeal." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 113 n.1 (2d Cir. 2024) (quoting *Selletti v. Carey*, 173

### DISCUSSION

On appeal, Xeriant argues that Auctus's conversion of debt into common stock is a securities transaction and unlawful under Section 15(a) of the Exchange Act because Auctus was not a registered dealer. According to Xeriant, this predicate Section 15(a) violation allows rescission of the SPA under Section 29(b). Xeriant contends, in the alternative, that the SPA is facially void because its terms provide for the purchase of a promissory note, which Xeriant contends is a "security" as defined under the Exchange Act.

Auctus argues principally that any purported securities transaction is tangential to the SPA, which provides for nothing more than a convertible loan. Auctus contends that the purchase of a convertible promissory note is not dealer activity as contemplated by Section 15(a), and reasons that even if it were, the SPA does not obligate Auctus to act as a dealer, thus invalidating Xeriant's Section 29(b) claim. Auctus also argues that Section 29(b) does not permit

---

F.3d 104, 109-10 (2d Cir. 1999)). Here, the district court granted Auctus's motion to dismiss with prejudice on February 9, 2024, and Auctus acknowledges that this Court has jurisdiction. *See* Appellee's Br. at 1. We therefore exercise jurisdiction over this case pursuant to 28 U.S.C. § 1291.

Xeriant to bring a private right of action, and that Xeriant's claim is otherwise

untimely.

## I.    *Standard of Review*

We review *de novo* the district court's grant of Auctus's motion to

dismiss.  *See City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173

(2d Cir. 2011).  A complaint is properly dismissed where it does not "contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In making this assessment, "a court

must 'accept as true all of the factual allegations set out in plaintiff's complaint,

draw inferences from those allegations in the light most favorable to plaintiff,

and construe the complaint liberally.'"  *Rescuecom Corp. v. Google Inc.*, 562 F.3d

123, 127 (2d Cir. 2009) (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)).

## II.    *The Merits*

Section 29(b) of the Exchange Act creates a private right of action for

parties seeking to rescind a contract made in violation -- or the performance of

which involved a violation -- of the Exchange Act.  Our determination of the

sufficiency of Xeriant's Section 29(b) claim, therefore, turns on whether Xeriant

has plausibly alleged that Auctus violated Section 15(a) of the Exchange Act. First, we consider whether Xeriant has plausibly alleged that Auctus is engaging in quintessential "dealer" activity in violation of Section 15(a). Second, we consider whether Xeriant has plausibly alleged that any such violation was obligated by the SPA and is a basis for rescission under Section 29(b).

**A.**     *Section 15(a)*

1.     *Applicable Law*

Section 15(a) of the Exchange Act prohibits a broker or dealer from "mak[ing] use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered." 15 U.S.C. § 78o(a)(1); *see SEC v. Almagarby*, 92 F.4th 1306, 1315 (11th Cir. 2024) ("Unregistered dealers are prohibited from buying and selling securities in interstate commerce."). "The term 'broker' means any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). The Exchange Act defines a dealer as "any person engaged in the *business of buying and selling securities* . . . for . . . [his] own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A) (emphasis added).

- 12 -

Recently, the SEC has brought enforcement actions under Section 15(a) against so-called "toxic lenders," *i.e.*, convertible debt purchasers who buy and then dump stock in small-cap companies to reap considerable returns. *See, e.g.*, *SEC v. Keener*, 102 F.4th 1328, 1331 (11th Cir. 2024) ("[Defendant's] lending behavior -- converting debt to stock at a significant discount and selling the resultant shares in high volumes -- is known as 'toxic' or 'death spiral' financing." (quoting *Almagarby*, 92 F.4th at 1312)). These actions, including the pending SEC lawsuit against Auctus in the District of Massachusetts discussed above, are premised upon the SEC's theory that buying convertible debt for the purpose of immediate conversion and resale is quintessential "dealer" activity, and lenders "cannot engage in these transactions without being a registered dealer." *Almagarby*, 92 F.4th at 1312. The Eleventh Circuit recently granted summary judgment in favor of the SEC in *Almagarby*, holding that a lender who bought penny-stock companies' convertible debt for immediate conversion and resale violated the Exchange Act by failing to register as a securities dealer. *See* 92 F.4th at 1306. The court determined that "[t]he volume and regularity of [the lender's] transactions support [our] ruling that [the lender] was 'in the business' of buying and selling securities." *Id.* at 1317 (quoting 15 U.S.C. § 78c(a)(5)(A)). It concluded

that profits generated from the "toxic lending activity" of purchasing convertible debt were linked to its failure to register as a dealer and subject to disgorgement. *Id.* at 1320-21.

The court in *Almagarby* was careful to limit its holding to the lender's "specific conduct," reasoning "that an expansive definition might sweep in all manner of market participants not traditionally understood as dealers, including investment advisors, mutual funds, pension funds, and other asset managers." *Id.* at 1318. Nevertheless, the court added that the lender's conduct in that case was significantly different from that of investment advisors or asset managers, because the latter do not "employ networks of finders to solicit microcap debtholders," or "rely on dilution financing or the rapid resale of microcap share issues as their sole source of income." *Id.*

Numerous district courts -- including the court that presided over the SEC enforcement action against Auctus -- have found that unregistered lenders are 'dealers' when, for instance, they acquire stock of microcap companies for immediate resale, engage in high volume resales of those shares, behave like underwriters when bringing new shares to the open market, and use third parties to solicit market participants on their behalf. *See, e.g., Auctus*, 2024

- 14 -

WL 3498593, at *5; *see also SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015) ("While evidence of merely *some* profits from buying and selling securities may alone be inconclusive proof, the defendants' *entire* business model was predicated on the purchase and sale of securities."). In other words, "at least at the pleading stage, the 'dealer' designation turns on whether the person or entity is 'in the business of buying or selling securities.'" *Auctus*, 2024 WL 3498593, at *3.[6] Each of the courts that has examined convertible debt lending practices, however, has done so in the context of an SEC enforcement action, and not, as here, in a private Section 29(b) rescission action.

### 2.    *Application*

We need not decide precisely what a plaintiff (or the SEC) must allege to state a violation of Section 15(a) because we assume without deciding

---

[6]    *See, e.g.*, *SEC v. Fierro*, No. 20-CV-02104, 2023 WL 4249011, at *6 (D.N.J. June 29, 2023) ("These undisputed share volumes, proceeds, and profits are strong indicators that Defendants engaged in the 'business' of buying and selling securities."); *SEC v. Carebourn Cap., L.P.*, No. 21-CV-2114, 2024 WL 4249546, at *3-4 (D. Minn. Sept. 20, 2024) (issuing a preliminary injunction for the lender's violation of Section 15(a)(1) because, *inter alia*, it purchased hundreds of convertible promissory notes and had transacted in the market for years). *But see Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 4:24-CV-00250, 2024 WL 4858589, at *8 (N.D. Tex. Nov. 21, 2024) ("Critically, the Eleventh Circuit in neither *Almagarby* nor *Keener* held that merely regularly buying and selling securities renders someone a dealer.").

that Xeriant has plausibly alleged that Auctus violated Section 15(a) of the

Exchange Act.  Xeriant's complaint, however, describes the "nature, volume,

regularity, and frequency" of Auctus's alleged transactions, which at least

arguably suggest that Auctus is in the business of buying and selling securities.

*Keener*, 102 F.4th at 1334.  For example, Xeriant alleged that: Auctus described its

fund philosophy as one that "invest[s] in public companies at either a significant

discount to what a stock investor would get or [to] get something of value for

free, ideally both," App'x at 20 (alteration in original); Auctus's conversion

demand would result in a real cost of $306,184,573.01 to Xeriant; Auctus has

engaged in a high volume of similarly usurious dealings with other companies;

and Auctus worked with Maxim to specifically solicit such microcap companies,

*see* App'x at 17-19, 21.  But we need not decide the issue, as we proceed by

assuming that Xeriant has plausibly alleged that Auctus is engaging in

quintessential "dealer" activity in violation of Section 15(a).

 **B.**  ***Section 29(b)***

   Assuming, as we do here, that Xeriant has plausibly alleged that

Auctus violated Section 15(a), we next assess whether Xeriant has sufficiently

alleged a claim for rescinding the parties' contract for such a predicate violation,

pursuant to Section 29(b).  We conclude that, because the SPA did not *require*

Auctus to engage in an unlawful transaction, *i.e.*, quintessential dealer activity,

the contract cannot be rescinded under Section 29(b).  In other words, because

the contract can be performed lawfully, and because the contract is silent as to if,

when, and how Auctus could sell discounted shares of Xeriant stock on the

market (assuming that is, indeed, unlawful), the contract has not been made in

violation of the Exchange Act.

      1.    *Applicable Law*

      Section 29(b) of the Exchange Act creates a private right of action for

parties seeking to rescind a contract made in violation -- or the performance of

which involved a violation -- of the Exchange Act.  *See* 15 U.S.C. § 78cc(b); *see also*

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("§ 29(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), confers a 'right to rescind' a

contract void under the criteria of the statute." (citation omitted)); *Ceres Partners*

*v. GEL Assocs.*, 918 F.2d 349, 361 (2d Cir. 1990) ("The [Exchange] Act expressly

- 17 -

provides for a number of private actions *i.e.*, under . . . [§] 29(b)." (citation

omitted)).[7]  Section 29(b) of the Exchange Act provides, in relevant part:

> Every contract made in violation of any provision of
> this chapter or of any rule or regulation thereunder, and
> every contract . . . heretofore or hereafter made, the
> performance of which involves the violation of, or the
> continuance of any relationship or practice in violation
> of, any provision of this chapter or any rule or
> regulation thereunder, shall be void . . . . *Provided*, . . .
> that no contract shall be deemed to be void by reason of
> this subsection in any action maintained in reliance
> upon this subsection . . . unless such action is brought
> within one year after the discovery that such sale or
> purchase involves such violation and within three years
> after such violation.

15 U.S.C. § 78cc.

---

[7]      To the extent that Auctus argues that Section 29(b) does not create a private right of action because Xeriant is not in the class for whose "especial benefit" the securities laws were enacted, its reasoning is contravened by this circuit's precedent.  Appellee Br. at 31.  Auctus relies on *Bennett v. U.S. Tr. Co. of N.Y.*, 770 F.2d 308, 312 (2d Cir. 1985), for the proposition that courts "impl[y] causes of action only for those in the class for whose 'especial benefit' the securities laws were enacted."  Appellee Br. at 31.  This Court in *Bennett*, however, relied on now overturned Supreme Court precedent and Section 7 of the Exchange Act, which does not on its face authorize a private right of action.  *See Bennett*, 770 F.2d at 311-13.  Since *Bennett*, we have interpreted the plain language of Section 29(b) -- deeming violative contracts "void" if "such action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after such violation" -- as creating a private right of action.  15 U.S.C. § 78cc(b); *Ceres*, 918 F.2d at 361.

We have previously left open the question of whether a rescission action under Section 29(b) may be predicated upon a Section 15(a)(1) violation, *see Boguslavsky v. Kaplan*, 159 F.3d 715, 722 n.6 (2d Cir. 1998), but district courts in this Circuit have found it may, *see, e.g., EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 80-82 (S.D.N.Y. 2020).  Indeed, Section 15 is not one of the enumerated exceptions to Section 29(b) private actions and nothing in the language of Section 29(b) indicates that a contract could not be rescinded for violating Section 15(a)(1).  Accordingly, we agree that Section 15(a)(1) can serve as a predicate statute to rescind a contract under Section 29(b).

Section 29(b) creates only a limited private right of action.  Indeed, "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts."  *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 421 (2d Cir. 2023) (quoting *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir. 1981)).  This limitation comports with "the common-law principle that a contract to perform an illegal act is void," *Vystar*, 336 F.R.D. at 81, whereas rescission is not available when "the violation complained of is collateral or tangential to the contract between the parties," *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984).  A

- 19 -

contract can be voided only where "there could be no performance under the contract without violating the [Exchange] Act." *Id.* (citing *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968)); *see also Williams v. Binance*, 96 F.4th 129, 144 (2d Cir. 2024) (finding that violations of the Exchange Act under Section 15(a)(1) "require transactions," and that "district courts in this circuit have long recognized that to make out a violation under Section 29(b), 'plaintiffs must show that the contract involved a prohibited transaction.'" (alteration adopted) (citation omitted)).

In *NexPoint*, we held that under Section 215(b) of the Investment Advisers Act of 1940 (the "IAA"), a securities statute nearly identical to Section 29(b), a contract is void "only if performing a contractual duty *requires* a party to engage in conduct prohibited" by the underlying statute. 80 F.4th at 422 (emphasis added); *accord Zerman*, 510 F. Supp. at 135. In reaching that conclusion, we relied upon the reasoning in a long line of cases in our district courts that have held that, to warrant contractual rescission under Section 29(b), a plaintiff must show that "performance of the contract *itself* is unlawful, not merely [that] the *conduct* of a party to the contract is unlawful." *NexPoint*, 80

- 20 -

F.4th at 421.[8]  We noted that these courts generally adopt Judge Friendly's reasoning that "[Section] 29(b) does not provide a pat legislative formula for solving every case in which a contract and a violation concur.  Rather it was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction." *Id.* (quoting *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly, *J.*, dissenting)).

We came to the same conclusion when interpreting a similar provision in the IAA's companion statute, the Investment Company Act of 1940 (the "ICA").  In *Oxford University Bank v. Lansuppe Feeder, LLC*, we held that the "Validity of Contracts" provision in the ICA applies only to *illegal* contracts, not legal contracts performed in an illegal manner.  933 F.3d 99, 105 (2d Cir. 2019).  In

---

[8]        *See, e.g.*, *DarkPulse, Inc. v. FirstFire Glob. Opportunities Fund, LLC*, No. 21-CV-11222, 2023 WL 199196, at *11 (S.D.N.Y. Jan. 17, 2023), *aff'd in part, vacated in part on other grounds*, No. 23-78, 2024 WL 1326964 (2d Cir. Mar. 28, 2024) (summary order); *EMA Fin. v. TPT Glob. Tech, Inc.*, No. 20-CV-8781, 2023 WL 7043227, at *5 (S.D.N.Y. Oct. 26, 2023); *Acuitas Cap., LLC v. Ideanomics, Inc.*, No. 23-CV-2124, 2023 WL 4373314, at *1 (S.D.N.Y. June 21, 2023); *EMA Fin., LLC v. AppTech Corp.*, No. 21-CV-6049, 2022 WL 4237144, at *6-7 (S.D.N.Y. Sept. 13, 2022); *Cyber Apps World, Inc. v. EMA Fin., LLC*, 645 F. Supp. 3d 281, 286 (S.D.N.Y. 2022); *Vystar*, 336 F.R.D. at 80-83; *Found. Ventures, LLC v. F2G, Ltd.*, No. 8-CV-10066, 2010 WL 3187294, at *6-8 (S.D.N.Y. Aug. 11, 2010); *Drasner v. Thomson McKinnon Secs., Inc.*, 433 F. Supp. 485, 501-02 (S.D.N.Y. 1977).

concluding that the plaintiffs had failed to state a claim under the ICA, we observed that the plaintiffs had "not identified any provision of the [contract] whose performance would violate the ICA." *Id.* at 109. We have reaffirmed this conclusion by observing that the aforementioned language in *Oxford University Bank* was not mere *dicta* but "a commonsense interpretation of statutory language." *NexPoint*, 80 F.4th at 420.

2.    *Application*

Xeriant contends that Section 29(b) provides a basis for rescinding the SPA because it was 1) made in violation of the Act and 2) performed in violation of the Act. According to Xeriant, the violation under either scenario occurred due to Auctus's failure to register as a dealer. We are not persuaded.[9]

The question we must ask is whether the SPA, when formed or performed, *requires* Auctus to transact securities while operating as an

---

[9]    Auctus claims that Xeriant waived the argument that the contract was void at formation because it failed to raise that claim before the district court. Even if not raised precisely below, Xeriant's claim as to both formation and performance of the contract rely on the same factual premise, namely that Auctus was acting as an unregistered broker-dealer. *See United States ex rel. Keshner v. Nursing Pers. Home Care*, 794 F.3d 232, 234 (2d Cir. 2015) ("[W]e have exercised our discretion to entertain new arguments . . . where the argument presents a question of law and there is no need for additional fact-finding." (internal quotation marks omitted)).

- 22 -

unregistered securities dealer.  It clearly does not.  The SPA provides only for the purchase of warrant shares.  Nowhere in its terms does the SPA require Auctus to sell converted shares on the market -- a core tenet of "dealer" activity.  Nor does the SPA require Auctus to convert the debt into shares, as opposed to accepting repayment of the cash loan.  Similarly, the exercise of stock options during the performance of the contract, alone, does not require registration as a dealer.  In other words, neither the terms of the contract itself nor its performance requires "a prohibited transaction."  *Vystar*, 336 F.R.D. at 81.[10] Consistent with our precedent, we conclude that the SPA is not an illegal contract and does not require Auctus to violate Section 15(a)(1).  Accordingly, we agree, as the district court held, that the parties' contract cannot be rescinded under Section 29(b).

---

[10]     Xeriant also argues, for the first time on appeal, that a promissory note is a security, rendering the SPA -- which provides for the purchase of a convertible promissory note -- facially illegal and subject to rescission under Section 29(b).  Indeed, convertible promissory notes are generally regarded as securities, *see Reves v. Ernst & Young*, 494 U.S. 56, 69 (1990), and must be registered or qualify for an exemption from registration under Section 4(a)(2) of the Securities Act, *see generally* 15 U.S.C. § 77d(a). One such statutory exemption excludes from registration transactions *not* involving a public offering.  *Id.* § 77d(a)(2).  Here, as the SPA explicitly provides, the purchase of the convertible promissory note falls under the Section 4(a)(2) exemption.  Accordingly, Xeriant's argument is meritless.

### III.    *Timeliness of Xeriant's Claim*

We briefly address Auctus's argument that the district court erred in holding that Xeriant's suit is not time-barred by the statute of limitations. We conclude that the district court correctly held that Xeriant's claim was timely filed.

In *Binance*, this Court held that "claims for recission under Section 29(b) expire one year after they accrue." 96 F.4th at 143. In that case, we reasoned that "because a Section 29(b) claim must be predicated on an underlying violation of the Exchange Act," a rescission claim does not accrue until a violative *transaction* has occurred. *Id.* at 144. In other words, where a contract does not commit the parties to making a violative transaction, the statute of limitations does not run from its formation.

This reasoning is grounded in the language of Section 29(b), which provides that a claim accrues "after the discovery that such sale or purchase involves such violation." 15 U.S.C. § 78cc(b). A Section 29(b) claim thus accrues when the plaintiff knew "or with due diligence should [have] know[n] [the] facts that . . . form the basis for [its] action." *Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010) (emphasis, internal quotation marks, and citation omitted). To dismiss at

the pleadings stage, "defendants bear a heavy burden in establishing that the plaintiff was on [constructive] notice as a matter of law." *Newman v. Warnaco Grp.*, 335 F.3d 187, 194-95 (2d Cir. 2003) (citation omitted).  Constructive notice "may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427 (2d Cir. 2008).

We agree with the district court that Auctus's statute of limitations argument fails.  Viewing the complaint in the light most favorable to Xeriant, the facts underlying Auctus's alleged status as an unregistered securities dealer were not appreciable to Xeriant with due diligence until the SEC filed its complaint in the District of Massachusetts in June 2023.  Although Xeriant could have discovered that Auctus was not registered with the SEC at the time of the SPA's signing, Xeriant had no reason to know -- or even investigate whether -- Auctus was operating a business that engaged in convertible lending to a degree that might render it a statutory securities dealer.  Accordingly, Xeriant's claim was timely brought.[11]

---

[11]     We note that if Xeriant is indeed correct that the SPA may be rescinded because

*CONCLUSION*

For the foregoing reasons, the decision of the district court is

**AFFIRMED**.

---

the mere purchase of a convertible promissory note is a violative securities transaction, then its claim would be time-barred because the limitations period would run from the formation of the contract and not from the date when the SEC filed its complaint.